*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 18**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

TOM GREGORY, et al.,
*Plaintiffs and Appellants,*
*v.*
MARK SHURTLEFF, et al.,
*Defendants and Appellees.*

Nos. 20110277, 20110473
Filed March 19, 2013

Third District, Salt Lake
The Honorable L. A. Dever
No. 080908814

Attorneys:

David R. Irvine, Janet I. Jenson, Alan L. Smith,
Salt Lake City, for appellants

John E. Swallow, Att'y Gen., Brent A. Burnett, Asst. Att'y Gen.,
Salt Lake City, for appellees

John L. Fellows, Robert H. Rees, Eric N. Weeks, Peter Asplund,
Salt Lake City, for amicus curiae

JUSTICE DURHAM authored the majority opinion in which
ASSOCIATE CHIEF JUSTICE NEHRING and JUSTICE PARRISH joined.

JUSTICE LEE filed a concurring, dissenting opinion in which
CHIEF JUSTICE DURRANT joined.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1 Appellants brought suit to enjoin the enforcement of a law, claiming that the law violated the state constitution in four respects. The district court dismissed the first two claims and rejected the second two claims on summary judgment. On appeal, we consider whether Appellants had standing to bring these claims in the first place. We hold that, although they lacked the personal injury required for traditional standing, Appellants had public-interest standing to bring the first two claims. We also hold that they did not have standing to bring the second two claims under either the traditional or the public-interest doctrine of standing, and we accordingly va-

cate the grant of summary judgment on those claims and remand to the district court for dismissal. Finally, we hold that although Appellants had standing to bring the first two claims, the district court properly dismissed the claims under Utah Rules of Civil Procedure, rule 12(b)(6).

## BACKGROUND

¶2    In March 2008, the legislature enacted Senate Bill 2 (the Bill). The Bill contained some fourteen items relating to education, establishing new programs and amending existing programs; it also contained funding provisions for some programs.

¶3    Appellants are a group of current and former legislators, other elected and unelected government officials, and self-described "good citizens." They include current and former members of the Utah State Board of Education (the Board). However, they appear in their individual capacities, and the Board itself is not a party to this litigation. In May 2008, Appellants filed suit in district court against the State's Attorney General, its Treasurer, and the Executive Director of the Department of Human Resources (collectively, Appellees), seeking a declaration that the Bill was unconstitutional and an injunction against its implementation, as well as an award of costs and fees.

¶4    Appellants claimed the Bill was unconstitutional in four respects. The first two claims fall under Article VI, Section 22 of the Utah Constitution, which provides that "no bill shall be passed containing more than *one subject*, which shall be *clearly expressed* in its title." (Emphasis added.) Appellants argue that the Bill as a whole violates this provision in two respects: first, they argue that it contained "more than one subject"; second, that its subject was not "clearly expressed in its title" (collectively, the Article VI Claims). The second two claims fall under Article X, Section 3 of the Utah Constitution, which provides that "[t]he general control and supervision of the public education system shall be vested in a State Board of Education." Appellants argue that two items of the Bill violate this provision: first, the item that delegates the administration of the Teacher Salary Supplement Program to the Department of Human Resources; second, the item that delegates textbook approval to private entities (collectively, the Article X Claims).

¶5    Appellees moved to dismiss the Article VI Claims pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. They subsequently moved to dismiss the Article X Claims for lack of standing and moved in the alternative for partial summary judgment on those

claims. The district court granted Appellees' motion to dismiss the Article VI Claims for failure to state a claim, and later granted the State's motion for summary judgment on the Article X Claims. It did not rule on the alternative motion to dismiss those claims for lack of standing.

¶6    Appellants timely appealed.[1] We permitted the Office of Legislative Research and General Counsel of the Utah Legislature to appear as amicus curiae.[2] At oral argument, we asked the parties to discuss whether Appellants had standing to bring any of their claims. We then ordered supplemental briefing on the standing question in regard to the Article X Claims.

¶7    We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶8    "We review the grant of a motion to dismiss for correctness, granting no deference to the decision of the district court." *State v. Apotex Corp.*, 2012 UT 36, ¶ 16, 282 P.3d 66 (internal quotation marks omitted). Further, "[o]n appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff." *Id.* ¶ 3 (internal quotation marks omitted).

## ANALYSIS

¶9    Since standing is a jurisdictional requirement, we first must determine whether Appellants have standing to bring any of their claims. Unlike in the federal system, our law recognizes that appropriate plaintiffs without individualized injury may nevertheless possess standing to bring certain claims treating issues of great public importance. We determine that the issues underlying the Article VI Claims rise to this level and that Appellants are appropriate parties to bring these claims; Appellants therefore have standing to raise

---

[1] Two separate appeals were taken to this court: No. 20110277, appealing from the dismissal of the Article VI Claims, and No. 20110473, appealing from the grant of summary judgment on the Article X Claims. The appeals were consolidated for the purposes of argument; we hereby fully consolidate them and dispose of both appeals with this opinion.

[2] Our order permitting the amicus brief specified that this court "will not assume any particular scope of representation vis-à-vis the members of the Legislature."

the Article VI Claims. The issues underlying the Article X claims, however, do not rise to this level, and furthermore Appellants are not appropriately situated to bring them. Accordingly, they do not have standing to raise the Article X claims.

¶10    On the merits of the district court's dismissal of the Article VI Claims, we hold that even on the facts alleged by Appellants, the Bill does not violate either the single-subject or clear-title rules of Article VI, Section 22. Accordingly, the dismissal is affirmed.

## I. STANDING

¶11    "[I]n Utah, as in the federal system, standing is a jurisdictional requirement." *Brown v. Div. of Water Rights of the Dep't of Natural Res.*, 2010 UT 14, ¶ 12, 228 P.3d 747.[3] Furthermore, "[s]tanding is an issue that a court can raise sua sponte at any time." *State v. Tuttle*, 780 P.2d 1203, 1207 (Utah 1989).

### A. Utah Recognizes Public-Interest Standing in Matters of Great Constitutional or Public Importance

¶12    "Unlike the federal system, the judicial power of the state of Utah is not constitutionally restricted by the language of Article III of the United States Constitution requiring 'cases' and 'controversies,' since no similar requirement exists in the Utah Constitution." *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983).[4] While it is "the

---

[3] In *Brown*, we considered whether property owners had standing to seek an injunction preventing their neighbor from constructing a bridge over a creek near the border between their properties. 2010 UT 14, ¶ 1. "[W]e conclude[d] that the Browns' complaint satisfie[d] our *traditional* test for standing . . . ." *Id.* (emphasis added). The dispute in *Brown* was patently not a candidate for public-interest standing, and indeed *Brown* does not discuss the alternative, public-interest test for standing. While "in Utah, as in the federal system standing is a jurisdictional requirement," *id.* ¶ 12, the contours of our requirements for standing differ from those in the federal system. Our jurisdictional requirement is satisfied by either the traditional test or the public-interest test.

[4] While the judicial power of the state of Utah is not restricted, as is the federal judicial power, by the language of Article III of the United States Constitution, our power is, of course, not unlimited. We have observed that "the Utah Constitution . . . mandates certain standing requirements, which emanate from the principle of separation of powers." *Brown*, 2010 UT 14, ¶ 12. But our standing requirements, based as they are on the law and constitution of our state, are not identical to those of the federal system. *Cf. Lansing Schs.*

(continued...)

usual rule that one must be personally adversely affected before he has standing to prosecute an action. . . . it is also true this Court may grant standing where matters of great public interest and societal impact are concerned." *Jenkins v. State*, 585 P.2d 442, 443 (Utah 1978).[5]

---

[4] (...continued)
*Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 694–95 (Mich. 2010) (discussed *infra* ¶ 17).

The dissent correctly observes that the judicial power of this court is limited by the principle of separation of powers. *Infra* ¶ 69. Indeed, that principle is enshrined in the state constitution. "The powers of the government of the State of Utah shall be divided into three distinct departments . . . and no person charged with the exercise of powers properly belonging to one of these departments, shall *exercise any functions* appertaining to either of the others . . . ." UTAH CONST. art. V, § 1 (emphasis added). In entertaining a claim that the Legislature has violated the constitutional restraints on its lawmaking procedures, we are not "exercis[ing] a function" of either of the other branches of government. As the dissent notes, *infra* ¶ 69 n.3, *see also infra* ¶ 89, separation-of-powers concerns support the traditional standing doctrine requiring individualized injury. But in the absence of a textual requirement of "case or controversy" akin to those of the federal Article III, these concerns do not reflect an absolute, constitutionally-imposed jurisdictional requirement, but rather a "historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums." *Jenkins v. Swan*, 675 P.2d at 1149. The questions, for instance, of what level of funding is appropriate for public education, or how that funding should be distributed across the state, are—in the absence of constitutional or statutory claims—classic examples of "disputes most amenable to resolution in" non-judicial fora. The question of whether a law was passed in violation of Article VI, Section 22 is not such a dispute.

The dissent asserts that it is not urging the wholesale adoption of federal standing doctrine. *Infra* ¶ 69 n.4. Indeed, it suggests that federal standing doctrine has become too lax, implicitly arguing that our state standing doctrine is properly *more restrictive* than the federal practice under Article III of the United States Constitution. We are aware of no state court—even among those which have explicitly rejected an alternative, public-interest standing doctrine—which has taken such a position.

[5] The dissent argues, *infra* ¶¶ 67–69, 91 that our recent opinion in *Utah Transit Authority v. Local 382 of the Amalgamated Transit Union*
(continued...)

¶13    "[D]espite our recognition of this Court's power to grant standing where matters of great public interest and societal impact are concerned," however, "this Court will not readily relieve a plaintiff of the salutory requirement of showing a real and personal interest in the dispute." *Jenkins v. Swan*, 675 P.2d at 1150 (internal quotation marks omitted). Therefore,

> we engage in a three-step inquiry in reviewing the question of a plaintiff's standing to sue. The first step in the inquiry will be directed to the *traditional criteria* of the plaintiff's personal stake in the controversy. . . . If the plaintiff does not have standing under the first step, we will then address the question of *whether there is anyone who has a greater interest* in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing. . . . The Court will deny standing when a plaintiff does not satisfy the first requirement of the analysis and there are potential plaintiffs with a more direct interest in the issues who can more adequately litigate the issues. The third step in the analysis is to decide if the issues raised by the plaintiff are of *sufficient public importance* in and of themselves to grant him standing.

---

[5] (...continued)
(*UTA*), 2012 UT 75, 289 P.3d 582, weighs in favor of the "repudiat[ion] of the public interest approach" to standing, *infra* ¶ 92. It does not. *UTA* did not establish new law or doctrine; it reiterated that parties seeking to avail themselves of the "public interest" exception to mootness must make a further showing that the dispute in question is capable of repetition yet likely to evade review. *See* 2012 UT 75, ¶ 33. Since mootness is a characteristic of a dispute between parties rather than a characteristic of the parties themselves, an exception to the usual prohibition on considering moot questions will hinge on the nature of the dispute. Conversely, traditional standing (or the lack thereof) is a characteristic not of the dispute between parties, but of the parties themselves. Therefore, the exception this court has established to the traditional standing requirements hinges not only on the importance of the dispute, but also on the nature of the party seeking to make the claim. *See infra* ¶¶ 15, 28–29, 35.

*Id.* (emphases added).[6]

¶14     In a more recent case, we summarized this alternative basis for standing as follows: "[T]he statutory and the traditional common law tests are not the only avenues to gain standing; Utah law also allows parties to gain standing if they can show that they are *an appropriate party* raising issues of significant public importance . . . ." *Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n*, 2009 UT 48, ¶ 8, 214 P.3d 95 (emphasis added).

¶15     In *Jenkins v. Swan* we framed the middle step of the "three-step inquiry" as "the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff." 675 P.2d at 1150. In *Cedar Mountain*, however, we modified the inquiry, requiring a determination of whether the plaintiff is "*an* appropriate party." 2009 UT 48, ¶ 8 (emphasis added). This shift in analysis is explained in intervening precedent. In 2006 we explained:

> Under the alternative test, a petitioning party must first establish that it is an appropriate party to raise the issue in the dispute before the court. A party meets this burden by demonstrating that it has the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions and that the issues are unlikely to be raised if the party is denied standing. We recognize that there is language in both *Jenkins* [*v. Swan*] and subsequent cases suggesting that in making this determination the court may grant standing only to the party with the greatest interest in the case, or in other words, the *most* appropriate party. We now conclude, however, that the notion that a court must find the *most* appropriate party, thereby limiting standing under the alternative criteria to only one party in any given case, is unnecessary and counter-productive. . . . [A] court addressing standing under the alternative test does not need to determine which party

---

[6] *See also Haymond v. Bonneville Billing & Collections, Inc.*, 2004 UT 27, ¶ 6, 89 P.3d 171 ("In matters of great public importance, we have employed other tests [than the traditional one] to evaluate whether a plaintiff should be allowed to pursue a lawsuit where he has sustained no injury. Standing may be found if the matter is of great public importance, if the plaintiff, although lacking a distinct injury is in as good a position to challenge the alleged illegality as any other potential plaintiff, and if the issue is unlikely to ever be raised if the plaintiff is denied standing to sue.").

seeking to intervene is the *most* appropriate party in comparison to any other potential party, but rather needs to determine only which parties are, in fact, appropriate parties to a full and fair litigation of the dispute in question.

. . . .

In addition, an appropriate party must still satisfy the second part of the alternative test before we will grant standing. Once a party has established that it is an appropriate party to the litigation, it must also demonstrate that the issues it seeks to raise are of sufficient public importance in and of themselves to warrant granting the party standing.

*Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶¶ 36, 39, 148 P.3d 960 (citations omitted) (internal quotation marks omitted).[7] *Cedar Mountain*'s more concise statement of the test is the applicable standard: "[P]arties [may] gain standing if they can show that they are an appropriate party raising issues of significant public importance . . . ." 2009 UT 48, ¶ 8. This is a two-part inquiry. *Id.* ¶ 15 ("[T]his test breaks down to two elements: (1) is the plaintiff an appropriate party; and (2) does the dispute raise an issue of significant public importance." (citing *Sierra Club*, 2006 UT 74, ¶¶ 36–39)).[8]

---

[7] This passage from *Sierra Club* also replaces a description of the *Jenkins v. Swan* test that we enunciated in *Kennecott Corp. v. Salt Lake County*, 702 P.2d 451 (Utah 1985). There, we framed the middle step as a requirement that "no one ha[ve] a greater interest than [the plaintiff]." *Id.* at 454. *Sierra Club* reformulated the middle step, which both *Jenkins v. Swan* and *Kennecott* described as a requirement that *no other* more appropriate potential party exist, to an examination of whether the plaintiff at bar is or is not appropriate. *Compare Sierra Club*, 2006 UT 74, ¶ 36 ("[T]he notion that a court must find the *most* appropriate party, thereby limiting standing under the alternative criteria to only one party in any given case, is unnecessary and counter-productive."), *with Kennecott*, 702 P.2d at 454 ("If the plaintiff has no standing under the [traditional test], then he may have standing if no one has a greater interest than he . . . ."), *and Jenkins v. Swan*, 675 P.2d at 1150 ("If the plaintiff does not have standing under the [traditional test], we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff.").

[8] *See also* 1A C.J.S. *Actions* § 107 (2005) ("When the issues sought
(continued...)

¶16    Our public-interest standing doctrine is not unusual in state jurisprudence. Numerous other states, mindful that their constitutions do not impose the same restrictions on their judicial power that the federal constitution imposes on federal courts,[9] have simi-

---

[8] (...continued)
to be litigated are of great importance and interest to the public, they may, in some jurisdictions, be resolved in a form of action that involves no rights or obligations peculiar to the named parties. The doctrine of great public interest or importance must, however, be applied with caution in expanding or relaxing the definition of standing. Its exercise must be a matter where strict standards are applied to avoid the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance. Standing may be found under a public interest standing test if the matter is of great public importance, if the plaintiff, although lacking a distinct injury is in as good a position to challenge the alleged illegality as any other potential plaintiff, and if the issue is unlikely to ever be raised if the plaintiff is denied standing to sue."(footnotes omitted)).

[9] The dissent argues that "the traditional standing requirement is rooted in the constitution," *infra* ¶ 72, and supports this argument by reference to language in Article VIII of the Utah constitution, *infra* ¶ 73. That language "confers on our courts the 'judicial power,' and . . . speaks of our authority to issue 'writs' and to decide 'cases.'" *Infra* ¶ 73 (quoting UTAH CONST. art. VIII, §§ 1, 3, 5). The dissent further argues that any alternative to traditional standing requirements would require "repeal or amend[ment of] the terms of Article VIII." *Infra* ¶ 72. But the dissent gives no suggestion of what the required constitutional text would say, nor does it cite an example from any other state constitution of an affirmative recognition of public-interest standing. In contrast, other state courts which—unlike Utah's—issue advisory opinions do so based on explicit constitutional authorization. *See, e.g.*, MASS. CONST. pt. 2, ch. 3, art. 2 (authorizing the issuance of advisory opinions "upon important questions of law, and upon solemn occasions"); *see also In re Advisory Opinion*, 335 S.E.2d 890, 891 (N.C. 1985) (declining to issue an advisory opinion on the ground that "[t]he North Carolina Constitution does not authorize the Supreme Court" to do so). At the state level, the recognition of an alternative form of standing is simply not the type of jurisprudential development which is predicated on explicit constitutional authorization. The dissent suggests that this court requires explicit textual authorization to articulate the scope of the judicial power to assess standing. We

(continued...)

larly established (under various names) a doctrine of public-interest standing.[10] *See, e.g., Trustees for Alaska v. State*, 736 P.2d 324, 329 (Alaska 1987) ("[T]axpayer-citizen status is a sufficient basis on which to challenge allegedly illegal government conduct on matters of significant public concern."); *Save the Plastic Bag Coal. v. City of Manhattan Beach*, 254 P.3d 1005, 1011–12 (Cal. 2011) ("[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the petitioner need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced. . . . We refer to this variety of standing as public interest standing." (alteration omitted) (internal quotation marks omitted)); *State ex rel. Cittadine v. Ind. Dep't of Transp.*, 790 N.E.2d 978, 980 (Ind. 2003) ("Indiana cases recognize certain situations in which public rather than private rights are at issue and hold that the usual standards for establishing standing need not be met. . . . [W]hen a case involves enforcement of a public rather than a private right the plaintiff need not have a special inter-

---

[9] (...continued)
reject this view.

The dissent asserts that "the conclusion (of unbridled, common-law power) does not at all follow from the premise (the lack of a 'case or controversy' clause)." *Infra* ¶ 105. First, we disagree with the characterization of our public-interest standing doctrine as "unbridled." Second, we note that the dissent does not suggest what *does* follow from our constitution's lack of a "case or controversy" requirement. Again, the dissent's only suggested difference between state and federal standing doctrine is that the latter has become too lax. *See supra* ¶ 12 n.4; *infra* ¶ 69. We disagree, and align with the courts of numerous other states in determining that the lack of a "case or controversy" requirement in our state constitution permits the development of alternative, public-interest standing doctrines.

[10] *See* 59 AM. JUR. 2D *Parties* § 30 (2d ed. 2012) ("Unlike the federal courts, state courts are not bound by constitutional strictures on standing as with state courts standing is a self-imposed rule of restraint. State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits. Standing in the state courts is a judge-made doctrine and is used to refuse to determine the merits of a legal controversy irrespective of its correctness where the party advancing it is not properly situated to prosecute the action." (footnotes omitted)).

est in the matter nor be a public official." (internal quotation marks omitted)); *Godfrey v. State*, 752 N.W.2d 413, 425 (Iowa 2008) ("We believe our doctrine of standing in Iowa is not so rigid that an exception to the injury requirement could not be recognized for citizens who seek to resolve certain questions of great public importance and interest in our system of government."); *New Energy Econ., Inc. v. Martinez*, 247 P.3d 286, 290 (N.M. 2011) ("We do not need to decide whether Petitioners have an actual beneficial interest because we conclude that they have standing under the great public importance doctrine. This court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." (alteration omitted) (internal quotation marks omitted); *State ex rel. Ohio Acad. of Trial Lawyers v. Sheward*, 715 N.E.2d 1062, 1082 (Ohio 1999) ("This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties.").

¶17    The case of Michigan is particularly illuminating. Recently, the Supreme Court of that state overruled a line of cases which "departed dramatically from Michigan's historical approach to standing." *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 689 (Mich. 2010); *see generally* Kenneth Charette, *Standing Alone?: The Michigan Supreme Court, the* Lansing *Decision, and the Liberalization of the Standing Doctrine*, 116 PENN ST. L. REV. 199 (2011). In restoring Michigan's traditional approach to standing, the *Lansing* court explained that "[t]here is no support in either the text of the Michigan Constitution or in Michigan jurisprudence . . . for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine." 792 N.W.2d at 693. The same is true of Utah's constitution and jurisprudence.[11]

---

[11] Some state courts have explicitly or implicitly rejected such an alternative standing doctrine. *See, e.g., Sears v. Hull*, 961 P.2d 1013, 1017-19 (Ariz. 1998); *In re Sandy Pappas Senate Comm.*, 488 N.W.2d 795, 797 (Minn. 1992); *City of Chattanooga v. Davis*, 54 S.W.3d 248, 280 (Tenn. 2001) ("We are aware that some commentators have criticized adherence to the particularized injury requirement of the standing doctrine . . . . Indeed . . . some states have adopted a 'public rights' exception to private party standing. . . . However, except with regard to the Office of the Attorney General, the courts of this state have yet to recognize a general 'public rights' exception to the  standing requirement, and we decline to do so in this case." (citations

(continued...)

¶18    We reaffirm today the teaching of our precedent that "Utah law . . . allows parties to gain standing if they can show that they are an appropriate party raising issues of significant importance." *Cedar Mountain*, 2009 UT 48, ¶ 8.

*B. Appellants Do Not Meet the Traditional Standing Criteria of Having a "Personal Stake in the Controversy" for Any of Their Four Claims*

¶19    As explained above, Appellees below moved to dismiss the Article X Claims for lack of standing. The district court, however, granted Appellees' alternative motion for summary judgment on those claims without ever ruling on the question of standing. Appellees had earlier moved to dismiss the Article VI Claims for failure to state a claim pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. Although that rule may be used to dismiss a claim for lack of standing, *see Anderson v. Dean Witter Reynolds, Inc.*, 920 P.2d 575, 577 (Utah Ct. App. 1996), Appellees invoked it only to assert that Appellants had failed to state a cause of action.  The district court therefore never considered whether Appellants had standing with respect to any of their claims.

¶20    As mentioned above, however, this court may raise standing "*sua sponte* at any time." *Tuttle*, 780 P.2d at 1207. We did so at oral argument, and then requested supplemental briefing on standing with respect to the Article X Claims. The arguments submitted by the parties in their supplemental briefs, however, are applicable to all four claims. For the following reasons, we determine that Appellants do not have traditional standing to raise any of their claims.

¶21    Appellants argue that they have traditional standing to bring the Article X Claims for two reasons. First, they argue that the challenged provisions of the Bill deny "plaintiffs as voters . . . their political prerogative, implicit in Article 10, Section 3, to hold Board members politically accountable by a meaningful exercise of the right to vote." This argument is not persuasive. To the extent that one's status as a voter in itself ever gives one a right to challenge legislation, it can only be through some form of an *alternative* form of standing, such as our public-interest doctrine. It does not consti-

---

[11] (...continued)
omitted)). But we have not followed that course.

As noted above, *supra* ¶ 12 n.4, the dissent's position goes well beyond that of states which reject alternative standing in its suggestion that our doctrine of standing should, if anything, be *more restrictive* than the federal one. *See infra* ¶ 69 n.4.

tute a "personal stake in [a] controversy." *Jenkins v. Swan*, 675 P.2d at 1150.

¶22    Appellants' second argument is that they have traditional standing to bring the Article X Claims because six of them are members of the Board.[12] They argue that the Salary Supplement Program and the Textbook Approval Program "positively forbid the members of [the Board] from exercising their Article 10, Section 3 powers respecting those programs. . . . mak[ing] it impossible for them to fulfill their oaths of office . . . and impair[ing] their ability, as candidates, in seeking re-election to office." This argument is similarly unconvincing. Appellants cite no authority for the proposition that elected officials have a vested interest in reelection sufficient to satisfy the traditional test for standing. And while it is true that elected officials who take oaths of office should take those oaths seriously, they likewise cite no authority establishing that taking such an oath gives them standing to challenge a law which they assert will infringe on their ability to faithfully execute it. Appellants are, in essence, asking that we view those who were members of the Board at the time they brought suit as being localized attorneys general, charged with constitutional authority to prosecute alleged violations of their portion of the constitution. This we decline to do.

¶23    For similar reasons, we determine that Appellants lack standing to bring those claims under the traditional doctrine of standing. As explained below, we conclude that they do have public-interest standing to bring the Article VI Claims. But that is only because we determine that violations of the provisions at issue in those claims are of sufficient public importance that they give Appellants standing to raise such violations in their role as citizens.

¶24    In previous cases where this court has reviewed the merits of a claim that either or both the single-subject and clear-title rules of Article VI, Section 22 have been violated, the plaintiffs alleged a direct and personal injury sufficient to satisfy the traditional stand-

---

[12] At least with respect to the federal system, "the Supreme Court [of the United States] has repeatedly held that if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." *Ry. Labor Execs. Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993). Because we determine that all Appellants lack traditional standing on all four of their claims, that all Appellants have public-interest standing on the Article VI Claims, and that all Appellants lack public-interest standing on the Article X Claims, we need not consider whether this principle applies in Utah law.

ing test. *See, e.g., State v. Barlow*, 153 P.2d 647, 655 (Utah 1944) (persons convicted under a law criminalizing polygamous lifestyle alleging "that the statute actually contains four subjects"); *Pass v. Kanell*, 100 P.2d 972, 973, 975 (Utah 1940) (renter and owner of car found liable for tort challenging statutory basis for liability as violating both the single-subject and the clear-title rules); *State v. Edwards*, 95 P. 367, 368 (Utah 1908) (court reporter alleging that a law which "affect[ed] his salary" violated the single-subject rule). While we determine below that the Article VI Claims treat issues of public significance and that Appellants are appropriately situated to bring them, comparison with the cases cited above clarifies that Appellants have standing to bring those claims only under the alternative public-interest doctrine. They do not have a "personal stake in the controversy." *Jenkins v. Swan*, 675 P.2d at 1150.[13]

### C. The Article VI Claims Rise to the Level of Great Constitutional Importance, and Appellants are Appropriately Situated to Raise Them

¶25 As explained above, Appellants do not meet the traditional requirements for standing on any of their four claims. We therefore consider whether they meet the requirements for public-interest standing. First, we examine their Article VI Claims, and determine that they do meet those requirements.

¶26 Article VI, Section 22 of the Utah Constitution provides: "Except general appropriation bills and bills for the codification and general revision of laws, no bill shall be passed containing more than

---

[13] Appellants further assert that they possess standing as taxpayers. Taxpayer standing may be understood as a subset of public-interest standing. *See, e.g., Olson v. Salt Lake City Sch. Dist.*, 724 P.2d 960, 962 & 962 n.1 (Utah 1986) (finding taxpayer standing to challenge disbursement of monies in a reserve fund by "applying the general principles enunciated in," inter alia, *Jenkins v. Swan* and *Kennecott*); *see also Brummitt v. Ogden Waterworks Co.*, 93 P. 828, 831 (Utah 1908) ("To the extent that the water rates are excessive his taxes are increased, and the mere fact that it increases in like proportion the taxes of all other taxpayers does not deprive him of the right to maintain an action to arrest the waste of public funds."). That doctrine is more appropriate, however, for claims with a direct relation to the expenditure of monies, typically at the local level. While the programs treated by the Bill, as with everything government does, cost taxpayer money, here Appellants' claims are properly analyzed not as taxpayer claims but as claims brought in the "public interest" in a more general sense.

one subject, which shall be clearly expressed in its title." These provisions, we have observed, "reflect[] an intent to limit legislative power and prevent special interest abuse" and are "clearly motivated by a wariness of unlimited legislative power." *Laney v. Fairview City*, 2002 UT 79, ¶ 34, 57 P.3d 1007.

¶27　The restrictions placed on legislative activity by Article VI, Section 22 of the Utah Constitution are part of the fundamental structure of legislative power articulated in our constitution. They are accordingly of sufficient importance and general interest that claims of their violation may be brought even by plaintiffs who lack standing under the traditional criteria.[14] Not every constitutional provision, to be sure, is of such importance that a claim of its violation will necessarily rise to the level of "significant public impor-

---

[14] In support of its argument that Utah's "judicial ancestry" includes a rule that "reserve[es] 'public' claims for public officials and allow[s] private suits only for special, individualized injuries," *infra* ¶¶ 82–83, the dissent cites *Crockett v. Board of Education*, 199 P. 158, 159–61 (Utah 1921). In that case, this court held that a taxpayer had standing to seek a writ to compel statutorily mandated financial disclosure from a governmental agency where the statute "was designed for the benefit and interests of the citizen taxpayers so that they [could] be informed." *Id.* at 159; *see infra* ¶ 83. Similarly, we have previously determined that the restrictions imposed on the legislative process by Article VI, Section 22 were designed for the public interest and benefit—specifically, to prevent private interest capture by requiring legislation to be transparently titled and narrow in scope. *See supra* ¶ 26; *Laney*, 2002 UT 79, ¶ 34. Where in *Crockett* we inferred standing from legislative design, here we infer it from constitutional design. *Crockett* does not undermine our analysis, but rather supports it.

The dissent references a second case in tandem with *Crockett*. In *Startup v. Harmon*, 203 P. 637 (Utah 1921), this court held that a taxpayer lacked standing to seek a writ compelling a county to disburse funds to widowed mothers, even where such disbursement was statutorily required. *Id.* at 641. The instant case is, in our view, much closer to *Crockett* than to *Startup*. Indeed, from a separation-of-powers perspective, *see supra* ¶ 12 n.4, if—as in *Crockett*—taxpayers have standing to compel the publication of statutorily required audits, recognition of standing is even more appropriate where parties request only that the courts consider whether a given law was passed in accordance with the constitution, since the determination of that question does not require this court to instruct another branch of government to do anything other than obey the constitutional limits on that other branch's power.

tance" required for public-interest standing under the formulation of *Cedar Mountain*, 2009 UT 48, ¶ 8. Our discussion below reveals, for instance, that delegations of particular functions to specific executive agencies may not rise to that level. But today we hold that the single-subject and clear-title rules of Article VI, Section 22 do.

¶28   Under *Cedar Mountain*, the importance of the issue by itself is not enough to give parties public-interest standing. One must also be "an appropriate party." *Id.*; *see also id.* ¶ 15 (emphasizing that "this test breaks down to two elements"). "[A]n appropriate party . . . . has the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions . . . ." *Sierra Club*, 2006 UT 74, ¶ 36 (internal quotation marks omitted). To demonstrate that it is an "appropriate party," a plaintiff must further show that "the issues are unlikely to be raised if the party is denied standing." *Id.* (internal quotation marks omitted).

¶29   First, Appellants are "appropriate parties" with "the interest necessary to effectively assist the court in developing and reviewing all relevant legal and factual questions" with respect to the Article VI Claims. The "appropriateness" of a party under the public-interest standing doctrine is a question of *competency*. In the *Sierra Club* case, we determined that the Club "would have standing under the alternative [public-interest] test" due to its policy concerns and status as an "entity focused on protecting the environment."[15] *Id.* ¶ 42. The coalition of Appellants in the instant case is not as well-established or long-standing as the Sierra Club, but it similarly has policy concerns and has come together to "focus[] on" the instant constitutional challenge. Further, Appellants have shown themselves able to "effectively assist the court" in its consideration of the Article VI Claims. While the district court dismissed those claims, and we affirm that dismissal, Appellants have nevertheless done an admirable job of briefing the facts and controlling law. That their complaint ultimately failed to state a claim does not mean that they were not appropriate parties to bring it. While we hold today that the Bill does not violate the clear-title and single-subject rules of Article VI, Section 22, Appellants have caused this court to consider

---

[15] The dissent correctly notes that in *Sierra Club* "the plaintiff satisfied traditional standing requirements." *Infra* ¶ 95. But whether or not "the court . . . need[ed] to opine about an alternative (public right) standing test," *infra* ¶ 95, the court did so "opine," in the form not of mere dicta but explicitly as an alternative holding. *Sierra Club*, 2006 UT 74, ¶ 35.

those rules and clarify the standards they impose for the first time in decades, and that in itself is a considerable achievement.[16]

¶30    Second, *Sierra Club* requires that "the issues [be] unlikely to be raised if the party is denied standing." *Id.* ¶ 36 (internal quotation marks omitted). We can certainly construct hypothetical plaintiffs who might be seen to have traditional standing to bring at least some of Appellant's claims. For instance, a teacher whose colleagues' salaries were raised under the Teacher Salary Supplement Program, but whose own salary was left unchanged, might invoke direct economic interests. Similarly, we can imagine a suit brought by a textbook publisher whose materials were rejected pursuant to the Textbook Approval Program. But our inquiry is not whether some hypothetical plaintiff can be imagined; it is whether "the issues are *unlikely* to be raised if the party is denied [public-interest] standing." *Id.* (emphasis added) (internal quotation marks omitted). Here, where the Board itself is silent and no other plaintiff has emerged in the years since the Bill's passage, we think that is indeed unlikely.

¶31    One more feature of our prior statements on public-interest standing deserves mention. In *Sierra Club*, we observed that a court's recognition that a party has public-interest standing analysis

---

[16] The dissent criticizes our discussion as "post-hoc" and "circular[]." *Infra* ¶¶ 107, 108. We do not feel that under the circumstances and procedural history of this appeal this criticism is warranted. Since standing was never ruled on below (and, indeed, was only ever raised by Appellees as a defense to the Article X claims, not the Article VI Claims), and was only addressed at appellate oral argument and in requested supplemental briefing, we have a full district-court record and appellate briefing by which to assess Appellants' competency and appropriateness vis-à-vis both sets of claims.

As the dissent observes, the standard we enunciate for the public-interest standing doctrine must be applied not only on appeal but at trial. *Infra* ¶ 108 n.26. In our discussion of the doctrine, and our differential treatment of the Article VI and Article X Claims (as well as Appellants' appropriateness with respect to both sets of claims), we have provided guidance for trial courts in future cases. But a universally applicable formulation is neither appropriate nor available in this area. Traditional standing requirements have themselves been the subject of much discussion and refinement in this and other courts; so too is such refinement proper with the alternative doctrine.

> requires the court to determine not only that the issues are of a sufficient weight but also that they are not more appropriately addressed by another branch of government pursuant to the political process. The *more generalized* the issues, the more likely they ought to be resolved in the legislative or executive branches.

*Id.* ¶ 39 (emphasis added) (citation omitted). But Article VI, Section 22 places restrictions on the legislative process itself. Where the legislature has passed a bill and the governor has signed it, we cannot assume that either of those branches are appropriate parties to whom to entrust the prosecution of a claim that the bill violates the strictures of Article VI, Section 22. And "more generalized" in this context speaks not to the general nature of the *interest*—for that is inherent in every issue of "sufficient weight" to justify the recognition of public-interest standing—but rather to the generalized nature of the *issue itself.*[17] In other words, public-interest standing should not be used by courts to engage in review of nonjusticiable political questions. Here, Appellants' claims do not raise that type of question. Rather, they seek to enforce an explicit and mandatory constitutional provision dealing primarily with questions of form and process. *See* UTAH CONST. art. I, § 26 ("The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise.").

¶32    We conclude that Appellants satisfy the requirements of the public-interest standing doctrine with respect to the Article VI Claims.[18]

---

[17] The dissent argues that the Article VI Claims "implicate issues that are among the most generalized one could imagine—involving structural restrictions on the legislative process, which affect all citizens in a general, undifferentiated manner." *Infra* ¶ 113 n.29. We disagree. The *interest* in seeing the legislature observe the constitutional restrictions on its power is general, but the *issue* is not general *in the relevant sense*—it is not a question of legislative policy or executive practice. The question of the constitutionality of the Bill's passage is a specific question of the type which it is the special province of the courts to decide. *See supra* ¶ 12 n.4.

[18] We are mindful that "[t]he doctrine of great public interest or importance must . . . be applied with caution," and that "[i]ts exercise must be a matter where strict standards are applied to avoid the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance." 1A

(continued...)

*D. The Article X Claims do not Rise to the Same Level of Great
Constitutional Importance, and Appellants Are Not Appropriately
Situated to Raise Them*

¶33     Article X, Section 3 of the Utah Constitution provides: "The general control and supervision of the public education system shall be vested in a State Board of Education." Appellants claim that the Bill violates this provision in two respects. First, they object to the Teacher Salary Supplement Program, which delegates to the Utah Department of Human Resources Management the duty of administering a pilot program to provide salary enhancements to certain science teachers in Utah public schools in order to dissuade them from seeking private employment. Appellants claim this is an unconstitutional delegation of an element of the "general control and supervision of the public education system" to an executive agency other than the one with that constitutionally specified role. Second, they argue that another provision of the Bill, which requires a private contractor to "evaluate and map the alignment of public school instructional materials" to the "core curriculum," unconstitutionally delegates another element of that "general control and supervision."

¶34     As explained above, Appellants do not have standing to bring the Article X Claims under "the traditional criteria of [having a] personal stake in the controversy." *Jenkins v. Swan*, 675 P.2d at 1150. For the following reasons, we determine that they also lack standing under the alternative public-interest standing doctrine. As articulated in *Cedar Mountain*, that doctrine provides that "parties [may] gain standing if they can show that they are an appropriate party raising issues of significant public importance." 2009 UT 48, ¶ 8. "[A]n appropriate party . . . . has the interest necessary to effectively assist the court in developing and reviewing all relevant

---

[18] (...continued)
C.J.S. *Actions* § 107 (2005). But in holding today that alleged violations of the requirements of Article VI, Section 22 are "questions . . . of great public importance," we do not rely on our own beliefs, but rather on the text and structure of our constitution. This court has previously determined that the requirements of Section 22 express the intent of the people "to limit legislative power and prevent special interest abuse," and that they are "clearly motivated by a wariness of unlimited legislative power." *Laney*, 2002 UT 79, ¶ 34; *see also Pence v. State*, 652 N.E.2d 486, 489 (Dickson, J., dissenting) (arguing that public-interest standing is appropriately recognized on alleged violations of a state's single-subject rule).

legal and factual questions . . . ." *Sierra Club*, 2006 UT 74, ¶ 36 (internal quotation marks omitted).

¶35 Appellants fail to satisfy either element of the public-interest standing test with respect to their Article X Claims. First, while we have explained above that Appellants are "appropriate part[ies]" to raise the Article VI Claims, they are not as well situated to raise the Article X Claims. While the restrictions on the legislative process imposed by Article I, Section 22 give every citizen of Utah an interest in seeing them obeyed, the delegation in Article X, Section 3 of "general control and supervision of the public education system" to the Board does not create such a general interest. Further, Appellants below and in their briefs and argument on appeal have not proved themselves able to "assist the court in developing and reviewing all relevant legal and factual questions." *Id.* ¶ 36. The crucial question of how we are to understand the scope of "general control and supervision of the public education system," and the related question of what the historical practice and traditional core functions of the Board have been, were never sufficiently framed and answered. This played a role in the district court's grant of summary judgment in favor of Appellees on the Article X Claims.

¶36 In addition to demonstrating that they are "appropriate part[ies]," plaintiffs must also raise issues of "sufficient public importance" to have standing under the public-interest doctrine. *Id.* ¶ 40. Every constitutional provision is surely important, but not every alleged violation of a constitutional provision will provide a basis for public-interest standing. As discussed above, the single-subject and clear-title rules imposed on the legislature by Article VI, Section 22 meet that standard. They are restrictions which must be observed every time the legislature exercises its core function of passing laws. The provision at issue in the Article X Claims, in contrast, is a delegation of a defined subject to a particular agency. While we do not conclude that such questions can *never* be appropriate ones in which to employ the public-interest standing doctrine, in combination with the Appellants' lack of "appropriateness" to treat them, their more localized significance renders the public-interest standing doctrine inapplicable to these plaintiffs on these claims.

¶37 Appellants further argue that their claims are unlikely to be brought by anyone else. As explained above, that is a necessary part of the showing parties must make under the public-interest standing doctrine. *Id.* ¶ 36. However, by itself it is not sufficient—and we have already determined that Appellants do not

meet the other criteria for public-interest standing. Accordingly, we vacate the entry of summary judgment against Appellants on the Article X Claims and remand to the district court. The district court is directed on remand to dismiss these claims for lack of standing.

## II. TRIAL COURT'S DISMISSAL OF ARTICLE VI CLAIMS

¶38 Having determined that Appellants, although they lack standing under "the traditional criteria of [having a] personal stake in the controversy," *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983), do have standing to bring the Article VI Claims under the alternative standard, we review the district court's grant of summary judgment on those claims. Again, Appellants claim that the Bill contains "more than one subject," and that its contents are not "clearly expressed in its title"; therefore, they argue, it violates Article VI, Section 22 in two respects. We determine that Appellants have failed to state a claim on either count.

### A. The Complaint did not State a Violation of the Single-Subject Rule

¶39 Again, Article VI, Section 22 provides that "no bill shall be passed containing more than one subject, which shall be clearly expressed in its title." Appellants argue that the Bill treats too many separate aspects of the public education system to pass muster under the single-subject rule. In their complaint, Appellants supported this claim by extensive reference to the legislative history of the items contained in the Bill. They point out that, when introduced as separate items, some had failed on a floor vote, some passed in one chamber but were held in committee in the other, and some were never submitted for even committee consideration as individual items. They further assert that popular bills were "used as hostages to extort or compel enactment of the less popular bills."

¶40 Almost a century ago, this court opined that while the single-subject rule

> is mandatory and binding alike upon the courts and the Legislature, yet it should be liberally construed in favor of upholding a law, and should be so applied as to effectuate its purpose in preventing the combination of incongruous subjects neither of which could be passed when standing alone. A too strict application of the provision might, however, result in hampering wholesome legislation upon any comprehensive subject rather than in preventing evils.

*Salt Lake City v. Wilson*, 148 P. 1104, 1109 (Utah 1915). *See also McGuire v. Univ. of Utah Med. Ctr.*, 603 P.2d 786, 789 (Utah 1979) (citing similar language from *State ex rel. Edler v. Edwards*, 95 P. 367, 368 (Utah 1908) as controlling authority). Furthermore, while bills must address a single subject, "'[t]here is no constitutional restriction as to the *scope or magnitude* of the single subject of a legislative act.'" *Martineau v. Crabbe*, 150 P. 301, 304 (Utah 1915) (emphasis added) (quoting the North Dakota Supreme Court's interpretation of their constitution's single-subject rule in *State v. Morgan*, 48 N.W. 314, 317 (N.D. 1891)). "A liberal view should be taken of both the act and the constitutional provisions so as not to hamper the law making power, but to permit the adoption of comprehensive measures covering a whole subject." *Kent Club v. Toronto*, 305 P.2d 870, 873 (Utah 1957) (discussing both the single-subject and clear-title rules).

¶41 Other state courts have given a similar "liberal[] constru[ction]" to their constitutions' single-subject rules.[19] *See, e.g., Legislature v. Eu*, 816 P.2d 1309, 1321 (Cal. 1991) ("[T]he single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. It is enough that the various provisions are reasonably related to a common theme or purpose." (citation omitted)); *Wirtz v. Quinn*, 953 N.E.2d 899, 905 (Ill. 2011) ("In determining whether a particular enactment violates the single subject rule, we construe the word subject liberally in favor of upholding the legislation. . . . However . . . the single subject requirement may not be circumvented by selecting a topic so broad that the rule is evaded as a meaningful constitutional check on the legislature's actions." (internal quotation marks omitted)); *Dague v. Piper Aircraft Corp.*, 418 N.E.2d 207, 214 (Ind. 1981) ("One basic principle of our review is that, in considering the validity of an act under this constitutional provision, a very liberal interpretation is to be applied, with all doubts resolved in favor of the legislation's validity."); *see also Comm. for a Healthy*

---

[19] The vast majority of state constitutions contain such provisions. *See* Millard H. Ruud, *"No Law Shall Embrace More Than One Subject,"* 42 MINN. L. REV. 389, 389 (1958) ("A one-subject rule for laws has found its way, in one form or another, into the constitutions of forty-one of our states."); *see also* Brannon P. Denning & Brooks R. Smith, *Uneasy Riders: The Case for a Truth-in-Legislation Amendment*, 1999 UTAH L. REV. 957, 963, 1005–23 (updating the count to forty-three and providing an appendix listing all state constitutions with single-subject and/or clear-title rules, with their exact wording and date of adoption).

*Future, Inc. v. Carnahan*, 201 S.W.3d 503, 511 (Mo. 2006) ("When reviewing a single subject challenge to an initiative petition, this Court must liberally and non-restrictively construe the petition in such a way that the provisions connected with or incident to the central purpose of the proposal are harmonized and not treated as separate subjects.").

¶42 Examined on its face,[20] under this liberal standard the Bill does not violate the single-subject rule. All its provisions deal with public education. With one very minor exception, all its enactments and amendments are confined to Title 53A of the Utah Code.[21] We do not suggest that such confinement to one title or general subject area will always shield a law from claims that it violates the single-subject rule. Nor do we suggest that legislation which amends items located in two or more titles will per se be ruled unconstitutional. We have never established, and do not create today, a precise formula for determining whether a challenged act "contain[s] more than one subject." UTAH CONST. art. VI, § 22. Such a formula may well be impossible to craft,[22] and might be undesirable even if it were possible.

¶43 It is easy to imagine a law that all would agree violates the single-subject rule. For instance, a bill dealing with pet licenses, mining regulation and beekeeping could not be plausibly argued to

---

[20] For the moment, we only consider whether the Bill facially violates the single-subject rule. Below, we discuss and reject Appellants' other arguments for violation.

[21] The one exception was an amendment in then-Title 63, Chapter 55B, a table of "Repeal Dates By Title." (That Chapter has since been renumbered as Title 63I, Chapter 2.)

[22] *See* Richard Briffault, *The Item Veto in State Courts*, 66 TEMP. L. REV. 1171, 1177–78 (1993) ("The notion of a subject is inherently incapable of precise definition. . . . Lacking a clear definition of 'single-subject' and reluctant to intervene in the internal workings of the legislative process, courts have generally held that the single-subject rule is to be given a 'liberal' interpretation and have strained to uphold the constitutionality of most challenged measures. The invalidation of a state law for a violation of the single-subject rule is a rarity." (footnote omitted)). *But see* Michael D. Gilbert, *Single Subject Rules and the Legislative Process*, 67 U. Pitt. L. Rev. 803, 819 & Fig. 1, 821 (2006) (purporting to show a dramatic rise in recent decades in the amount of single-subject challenges nationwide and concluding that "[i]n recent years, single subject litigation has blossomed").

fit under any all-encompassing rubric less general than "legislation," or at the most specific "safety" (assuming that the pet licensing regime had that as its purpose).[23] Similarly, one can imagine items

of legislation so targeted that no plausible argument could be made that they violate the single-subject rule. Most actual legislation, of course, falls somewhere in between, and while the single-subject rule is mandatory and must be policed by this court, *see supra* ¶ 27, under our tradition of liberal construction a bill addressing even a relatively large number of educational programs does not violate that rule. *Cf. Akin v. Dir. of Revenue*, 934 S.W.2d 295, 302 (Mo. 1996) (holding that a bill containing some twenty enactments and thirty-eight reenactments in the area of education, along with various revenue mechanisms to fund those laws, does not violate the single-subject rule "[g]iving the measure the liberal reading required to sustain its constitutionality . . . [because it] contains only one subject, education.").

¶44    In addition to their general argument that the Bill contains too many disparate subjects, Appellants argue that it violates the single-subject rule for two specific reasons. First, they argue that it combines substantive law and appropriations measures,[24] and that

---

[23] The federal constitution, of course, lacks a single-subject rule, and federal acts often take the form of a congeries of subjects no less incongruous than the three listed above. *See generally* Denning & Smith, *supra* ¶ 41 n.19 (arguing for the adoption of a single-subject rule at the federal level); *cf. Wash. State Legislature v. Lowry*, 931 P.2d 885, 895 (Wash. 1997) ("Our [state] constitution also evidences a clear policy that bills should pertain to single subjects and should not be encumbered by 'riders' containing divergent subjects, as is the practice in Congress . . . .").

Some state courts appear to have set the bar for what constitutes a violation of the single-subject rule at the level of total incongruity. *E.g.*, *People v. Cervantes*, 723 N.E.2d 265, 267 (Ill. 1999) ("[A] legislative act violates the single subject rule when the General Assembly includes within one bill unrelated provisions that by no fair interpretation have any legitimate relation to one another." (internal quotation marks omitted)). We need not establish so liberal a test in order to conclude that the Bill in question today does not violate the single-subject rule.

[24] In addition to individual programs enacted or amended, including the Textbook Approval and Teacher Salary Supplement Programs, the Bill also both provided funding for programs

(continued...)

such a combination is a per se violation of the rule. Second, they include in their complaint a detailed legislative history of the components of the Bill, and argue that the fact that some of these components were rejected by the legislature as individual bills, while others passed committee or a floor vote in one house but were then held and combined with the rest of the Bill's components, demonstrates that the Bill constitutes impermissible "bundling" and "log-rolling" in violation of the spirit of the single-subject rule.[25]

¶45 Appellants urge us to adopt what they represent as the rule of *Washington State Legislature v. State*, 985 P.2d 353 (Wash. 1999): a bright-line test holding that the combination in one bill of substantive and appropriations measures violates the single-subject rule. While conceding that we have never before set such a test, Appellants argue that dicta in four of our previous opinions suggest such a result. But it is not clear to us that *Washington State Legislature* establishes any such bright-line test. Because the provision at issue was an item "in an omnibus appropriations or operating budget bill" that "restrict[ed] access to public assistance eligibility," the court held that it violated the single-subject rule and struck it on that basis. *Id.* at 355, 363. The Bill before us neither "defines rights or eligibility for services" in the sense of the provision scrutinized in *Washington State Legislature*, nor is it included in a general "operating budget bill."[26] Accordingly, we do not see this case as providing persuasive authority that we should (1) announce a bright-line standard that any combination of funding and substantive measures violates the single-subject rule and then (2) find that the Bill violates that rule and accordingly declare it unconstitutional under Article VI, Section 22 of the Utah Constitution.

¶46 We are similarly unpersuaded by Appellants' argument that we have already endorsed such a bright-line standard. For instance, Appellants cite *Carter v. State Tax Commission*, 96 P.2d 727, 733–34 (Utah 1939). There, we held that a specific part of a "plan of

---

[24] (...continued) established in the bill and adjusted funding levels for already existing programs.

[25] *See Pass v. Kanell*, 100 P.2d 972, 978 (Utah 1940) (identifying the prevention of "hodge podge or 'log rolling' legislation" as "one, and perhaps the primary, object of" the single-subject rule (internal quotation marks omitted)).

[26] We note that general appropriations bills are specifically exempted from the single-subject rule. UTAH CONST. art. VI, § 22.

graduating [motor vehicle registration] fees according to the propensity of the vehicle to injure the highways" based upon "the fuel used in the engine of the vehicles" violated the single-subject rule. *Id.* at 733. Our explanation for this holding was that "[w]e have here an obvious departure from any thought of wear and tear upon the road"; the type of fuel used by a vehicle "bears no relationship to the object of the legislation." *Id.* In other words, *Carter* ruled that a provision that bore "no relationship" to a bill's larger purpose violated the single-subject rule — not, as Appellants frame it, because it was a revenue measure, but because it was incongruous with the rest of the bill.

¶47    Among Appellants' other citations is one to *Petty v. Utah State Board of Regents*, 595 P.2d 1299 (Utah 1979). There we said "it is important to have in mind that the purpose of the Appropriations Act is to allocate finances, and not to affect substantive changes in the law on other matters." *Id.* at 1301. But the very next sentence reads: "Consequently, it is our opinion that such an expression of intent in an appropriations act should not be regarded as repealing or superseding other existing statutory law." *Id.* In *Petty*, the plaintiff was a student arguing that a statement of "the intent of the Legislature" as to the appropriate level of tuition for medical students prevented the Board of Regents charging fees beyond that level. *Id.* at 1300. In ruling that this statement of "intent" in a general appropriations bill had no substantive effect, we did not mention the single-subject rule. Appellants cite this case for its supposed analogic strength, but we do not see an analogy to the claims before us.

¶48    We are unpersuaded by these cases, and by the other cases cited by Appellants in their urging us to establish a rule that the combination of substantive and appropriations measures always violates the single-subject rule. We therefore decline to adopt such a rule. As explained above, the Bill on its face treats a single, albeit broad, subject: education. The presence in the Bill of funding measures directed towards education programs does not render it unconstitutional. We are left, then, with Appellants' remaining argument on this point: that the legislative history of the items in the Bill reveal that it is the product of impermissible "log-rolling," and that it therefore violates the single-subject rule.

¶49    In Appellants' description, the Bill

is the sum of 14 bills, all of which started as single subject measures. All initially were introduced, reviewed, considered, and debated as separate, stand-

alone legislation. Two of these bills were defeated by majority vote in the House. Two others lacked sufficient merit to survive committee hearings. These failed bills were revived and, through bundling . . . [,] were allowed to ride "piggy-back" on popular legislation and money measures to enactment at the eleventh hour of the 2008 general session.

For three reasons, however, we conclude that these facts—even taken at face value, as we do when reviewing the grant of a motion to dismiss—do not state a claim that the Bill violates the single-subject rule.

¶50    First, the text of Article VI, Section 22 speaks to the contents and title of the Bill itself; it makes no reference to legislative motive. We have determined that the Bill itself, in treating multiple programs related to education, handles a "single subject"; we further determine that an itemized list of those programs is a clear expression of the Bill's content, which is what the clear-title rule requires. It is true that in *Wilson* we identified the "purpose" of the single-subject rule as "preventing the combination of *incongruous subjects* neither of which could be passed when standing alone." 148 P. at 1109 (emphasis added). But in light of our tradition of liberally construing the single-subject rule, *see id.*, we have already concluded that the subjects in the Bill are *not* incongruous in the constitutional sense. Therefore, even taking at face value Appellants' assertions that portions of the Bill "could [not] be passed when standing alone," *Wilson* neither requires nor empowers us to find them unconstitutional solely on that basis if we have not determined that they are "incongruous." While the prevention of "log-rolling" may be a *purpose* of the single-subject rule, the *text* of that rule requires us to focus on a bill's contents, rather than conducting a review of a law's "backstory" as revealed in legislative history.

¶51    Second, Appellants have not identified—and we have not independently found—any prior opinion of this court that analyzes a single-subject claim by reference to the legislative history of the bill at issue. Appellants cite *McGuire*, 603 P.2d 786, and *Jensen v. Matheson*, 583 P.2d 77 (Utah 1978), for the proposition that this court has previously examined legislative journals in its Article VI, Section 22 jurisprudence. This is true, but those cases dealt with other provisions of the section: respectively, the clear-title rule and a

voting/recordation provision.[27] *McGuire*, 603 P.2d at 790; *Jensen*, 583 P.2d at 79–80. These cases do not establish the propriety of undertaking an extensive search of legislative history in the application of the single-subject rule, and we are not persuaded that we should depart from an examination of the Bill on its face, at least absent any ambiguity or other interpretive problems revealed by such a facial examination. To do so would put us in the position of examining the motives and strategies of the Legislature, rather than its acts.

¶52 Finally, where a bill has not been shown to violate the single-subject rule, separation-of-powers considerations make us hesitate to inquire into the internal process that led to the bill's passage. Sometimes we are required to, as it were, "pierce the veil" of the legislative text—for instance, when a facially neutral bill is alleged to have some impermissible invidious motive. And allegations of outright illegality, in the form of bribery or the like, have their remedy elsewhere in the law. But the line between forbidden "log-rolling" and mere "horse-trading" may be a fine one, and we are not confident in our ability—or even our constitutional power—to police it in the manner which Appellants ask of us.

*B. The Complaint did not State a Violation of the Clear-Title Rule*

¶53 The Bill was entitled "MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS." Under this title came a caption identifying the session in which the Bill was submitted and its chief sponsor and sponsor in the House. Under this caption came a double line, then the following: "LONG TITLE[.] General Description: This bill provides funding for the Minimum School Program and other education programs. Highlighted Provisions: This bill: [followed by a bullet-pointed list of short descriptions of the various components of the bill]."[28] Appellants argue that the Bill violates the clear-title rule for two reasons. First, they argue that the "short title" is under-inclusive and misleading. Second, they argue that the "long title" does not cure the constitutional defect.

---

[27] "The vote upon the final passage of all bills shall be by yeas and nays and entered *upon the respective journals* of the house in which the vote occurs." UTAH CONST. art. VI, § 22 (emphasis added). This provision clearly contemplates an examination of material in addition to the final bill; the single-subject rule does not.

[28] See Appendix for a representation of the entire introductory section to the Bill, including both its "short" and "long title."

¶54 This court considered the clear-title rule in Utah's first year of statehood. *Ritchie v. Richards*, 47 P. 670 (Utah 1896). There, we held that a bill entitled "An act relating to and making sundry provisions concerning *elections*," *id.* at 671 (emphasis added), could not constitutionally contain a provision governing the *appointment* of persons to vacated positions. *Id.* at 674. "This section," we determined, "does not relate to elections, nor does it concern elections. Therefore the title does not embrace it." *Id.*

¶55 A justice of a later generation enunciated general principles that guide our application of the clear-title rule:

> [T]he title is sufficient if it is not productive of surprise and fraud and is not calculated to mislead the legislature or the people, but is of such character as fairly to apprise the legislators and the public of the subject matter of the legislation and to put anyone having an interest in the subject on inquiry.

*Thomas v. Daughters of Utah Pioneers*, 197 P.2d 477, 508 (Utah 1948) (Latimer, J., concurring). A more recent opinion saw the purpose of the clear-title rule as ensuring that "the legislators will be advised of the subject and purpose of the act in order that there be no misunderstanding, omitting, nor burying or obscuring of what is being proposed." *Jensen*, 583 P.2d at 80.

¶56 Here, the bill's "long title" informs the reader that "[t]his bill provides funding for the Minimum School Program and other education programs," proceeding to give a full list of those programs in bullet-point format. This is constitutionally sufficient—*if* the "long title" can be considered part of the "title" which the constitution says must "clearly express[]" the bill's "subject." UTAH CONST. art. VI, § 22.

¶57 Appellants insist it cannot be so considered. First, they observe that Article VI, Section 22 speaks of the bill's "title" in the singular. Second, they argue that our case law has treated additional or supplementary titles of laws as unnecessary surplusage. Third, they argue that the clear-title rule is intended to benefit the public and that the public is less likely than the legislators to notice the presence of such additional titles.

¶58 Appellees and Amicus counter that a "long title" is an acceptable manner of observing the constitutional clear-title rule, and that in this case the Bill's "long title," as the constitution requires, clearly expresses the Bill's subject. We agree that the "long title" of this Bill is its title for purposes of Article VI, Section 22 and

that it clearly expresses the Bill's subject. The Bill therefore does not violate the clear-title rule.

¶59    First, the fact that Article VI, Section 22 speaks of a bill's "title" in the singular is not dispositive. The Bill before us *has* a singular title. That title, it is true, is divided into a five-word header ("MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS") and a longer title, which is in turn divided into a "General Description" and a list of "Highlighted Provisions." But the text of Section 22 does not indicate how long or detailed a bill's "title" must be, or whether it may be divided into sub-parts. As we have interpreted and applied it above, the single-subject rule permits one bill to treat multiple aspects of the public education system. Accordingly, a title such as the one this Bill has is arguably the fairest way of putting legislators and citizens on notice of what the Bill contains.[29] If the Bill's contents are constitutional in scope—and we have determined that they are—then an itemized description of them is a constitutionally acceptable way to "clearly express[]" those contents.

¶60    Second, Appellants cite *Edwards*, 95 P. at 369, in support of their argument that "the use of a second title may be constitutionally improper." The case is inapposite. In *Edwards*, we determined that certain "extraneous matter added to what constitutes the actual title is *harmless.* . . . [and] wholly unnecessary, and the elimination of this surplus matter is . . . required of us in order to preserve" an otherwise constitutional law. *Id.* (emphasis added). But here we have, if anything, the opposite situation. By itself, "MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS" might well be unconstitutionally under-inclusive. The "long title," with its list of programs contained in the Bill, removes the cloud over the Bill's constitutionality.[30]

---

[29] General principles of separation of powers further suggest that we ought to refrain from dictating to the Legislature the *form* that the titles of its laws must take. The state constitution requires only that titles clearly express their bills' subjects. We are wary of imposing further requirements.

[30] Appellants also cite *Marioneaux v. Cutler*, 91 P. 355, 359 (Utah 1907) ("[T]he Legislature may not disregard the [clear-title rule] by simply making the legislative intention clear in the act itself."). But that case *upheld* the challenged provision, since "a reasonable doubt exist[ed] . . . whether the subject of the act is expressed in the title, [and] such doubt will be resolved in favor of the act." *Id.*

¶61    Third and finally, we disagree that the "long title" is of use only to legislators. It is not written in technical or misleading language. It puts anyone reading it, whether they be a member of the legislature or of the general public, on notice of the Bill's contents. For all these reasons, we determine that the full title of the Bill comports with the constitutional requirement that it "clearly express[]" the subject of the Bill. UTAH CONST. art. VI, § 22.

## CONCLUSION

¶62    We determine that Appellants do not have standing to bring any of their claims under the traditional doctrine of standing. We further determine that they lack standing to bring the Article X Claims even under the alternative doctrine of public-interest standing. Accordingly, we vacate the district court's grant of summary judgment and remand with respect to those claims, directing the court on remand to dismiss them for lack of standing. We further determine that Appellants do have standing to bring the Article VI Claims under the doctrine of public-interest standing. Since their complaint fails to state a claim for violation of either the single-subject or clear-title rules, however, we affirm the district court's dismissal with respect to those claims.

## APPENDIX

[The following is a representation of the entire introductory portion of the Bill, containing both its short title and its long title]

**MINIMUM SCHOOL PROGRAM BUDGET AMENDMENTS**

2008 GENERAL SESSION

STATE OF UTAH
[names of sponsoring legislators omitted]

**LONG TITLE**

**General Description:**

This bill provides funding for the Minimum School Program and other education programs.

**Highlighted Provisions:**

This bill:

-- establishes the value of the weighted pupil unit at $2,577;

-- establishes a ceiling for the state contribution to the maintenance and operations portion of the Minimum School Program for fiscal year 2008-09 of $2,497,012,086;

-- modifies provisions related to the funding of charter schools;

-- modifies requirements regarding instructional materials;

-- authorizes the use of appropriations for accelerated learning programs for International Baccalaureate programs;

-- modifies the positions that qualify for educator salary adjustments and increases the salary adjustments for those positions;

-- establishes and funds the following ongoing programs:

  ○ a pilot project using a home-based educational technology program to develop school readiness skills of preschool children;

  ○ a financial and economic literacy passport to track student mastery of certain concepts;

  ○ the Teacher Salary Supplement Program to provide a salary supplement to an eligible teacher;

  ○ stipends for special educators for additional days of work;

  ○ an optional grant program to provide an extended year for math and science teachers through the creation of Utah Science Technology and Research Centers;

  ○ the High-ability Student Initiative Program to provide resources for educators to enhance the academic growth of high-ability students;

  ○ the English Language Learner Family Literacy Centers Program; and

  ○ career and technical education online assessment;

-- makes one-time appropriations for fiscal year 2008-09 for:

  ○ pupil transportation to and from school;

  ○ the Beverly Taylor Sorenson Elementary Arts Learning Program to provide grants to integrate arts teaching and learning into selected schools; and

  ○ classroom supplies;

-- provides a repeal date for certain pilot pograms;

-- makes nonlapsing appropriations; and

32

-- makes technical corrections.

**Monies Appropriated in this Bill:** [followed by nine enumerated appropriations]

**Other Special Clauses:**

This bill provides an effective date.

This bill coordinates with H.B. 1 by providing superseding and substantive amendments.

**Utah Code Sections Affected:** [followed by a list of sections amended and enacted]

———

JUSTICE LEE, concurring in part and dissenting in part:

¶63   In the past several decades, this court's standing jurisprudence has strayed further and further from its traditional mooring in the judicial power clause of the Utah Constitution. Thus, although we have long recognized a "traditional" conception of standing requiring individualized injuries sustaining private rights of action, our more recent decisions have exhibited increasing willingness to overlook that requirement under a "public interest" exception. That exception, as reconceived by the court today, stretches the principle of standing beyond recognition.

¶64   I respectfully dissent from the majority's invocation—and extension—of this "public interest" exception to the traditional requirement of standing. Its methodology is incompatible with the judicial power clause in Article VIII of the Utah Constitution. That clause limits our authority to the resolution of cases that fall within the traditional conception of the judicial power. In overriding these constraints, the majority robs the constitutional limits on our power of meaningful content. It does so to uphold standing for the Article VI claimants in this case on public interest grounds, thereby subjecting the standing inquiry to the arbitrary discretion of the court, under a standardless "test" that is little more than a post-hoc justification for a preferred result. Under this test, the standing question is left to a subjective, case-by-case assessment of a majority of the court as to whether the claims seem sufficiently "important" to merit review.

¶65   Instead of expanding the public interest exception, I would repudiate our prior dicta on this point and reject the exception altogether. And I would resolve the case under a traditional formulation of standing—one requiring an assertion of injury sustaining a private action. That formulation, in my view, requires dismissal of all of the claims at issue in this case, including the Article VI claims the majority reaches on public interest grounds.

## I. STANDING AS A CONSTITUTIONAL COMPONENT
## OF THE JUDICIAL POWER

¶66    Standing is not a judge-made principle of judicial restraint subject to common-law evolution over time. It is an essential element of the constitutional provisions defining and limiting the judicial power. Such an element requires careful definition, rooted in an interpretation of the binding text of our constitution. We assail the very principle of constitutionalism when we ignore that interpretive role and opt instead to invoke and refine standardless "exceptions" justifying (but failing to explain) our case-by-case preferences to exercise jurisdiction in some cases but not in others.

¶67    We recently underscored these central points in the parallel context of our mootness doctrine. In *Utah Transit Authority v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, 289 P.3d 582, we repudiated a freestanding,[1] discretionary "public interest" exception to the doctrine of mootness, explaining that mootness is an essential "element of the principles defining the scope of the 'judicial power' vested in the courts by the Utah Constitution," not a "simple matter of judicial convenience or ascetic act of discretion." *Id.* ¶ 18. After identifying the historical basis for foreclosing the use of judicial power to issue advisory opinions, our opinion in *Utah Transit Authority* chided the parties for urging our invocation of standardless "discretion" to exercise judicial power withheld by traditional constitutional bounds, noting:

> The notion of such discretion is repugnant to the very idea of a written constitution. That document protects us by setting forth fundamental limitations on government authority that cannot be crossed or disregarded as a matter of convenience or discretion. We accept that principle as established orthodoxy on

---

[1] The *Utah Transit Authority v. Local 382 of the Amalgamated Transit Union* opinion clarified that the so-called "public interest" exception to our mootness doctrine is not a one-part inquiry that may be "satisfied by showing only that a matter involved the public interest." 2012 UT 75, ¶ 31 n.18, 289 P.3d 582. Rather, the exception requires a litigant to show that a matter "(1) presents an issue that affects the public interest, (2) is likely to recur, and (3) because of the brief time that any one litigant is affected, evades review." *Id.* ¶ 32. Because we deemed the notion of a "public interest exception" more confusing than helpful, we repudiated that label, reinforcing our holding that the "public interest" alone is an inadequate ground for exercising jurisdiction over a moot case. *Id.* ¶ 33.

matters of individual rights such as that of free speech or double jeopardy. But it is no less viable on matters defining the structural scope of the powers of the branches of government.

*Id.* ¶ 25 (citation omitted).

¶68    Our *Utah Transit Authority* opinion also clarified the appropriate methodology for interpreting the constitutional limits on our judicial power. While recognizing that the text of Article VIII's articulation of "[t]he judicial power of the state" does not "reveal the precise scope" of our power, we emphasized "one fundamental point": "The scope of our authority is not a matter for the courts to define at our preference or whim; we are constitutionally limited to wield only 'judicial power' and may not act extra-judicially (regardless of how interesting or important the matter presented for our consideration)." *Id.* ¶ 20 (alteration in original) (internal quotation marks omitted); *see also Mellor v. Wasatch Crest Mut. Ins.*, 2012 UT 24, ¶ 14, 282 P.3d 981 ("The limits on our jurisdiction are legal rules that define the nature and extent of the judicial power, not mere guidelines to be invoked or discarded at our whim."). And to give content to the text of the constitution, we turned to the traditional understanding of the judicial power, identifying long-established case law and constitutional history that informed the mootness doctrine's limitations on the judicial power.[2] *Utah Transit Auth.*, 2012 UT 75, ¶¶ 21–24.

¶69    As set forth in detail below, an inquiry in this case following the model set out in *Utah Transit Authority* reveals that standing, like mootness, places well-defined, principled limitations

---

[2] The majority seeks to undermine the import of our *Utah Transit Authority* opinion on grounds purportedly distinguishing mootness and standing. In the majority's view, mootness somehow concerns only a "characteristic of a dispute between the parties," while standing simply respects a "characteristic . . . of the parties themselves." *Supra* ¶ 12 n.5. These are semantic distinctions without any analytical difference. In reality, both mootness and standing concern the interests of particular parties in a particular dispute—such that the characteristics of both the parties and the dispute are relevant. And because both mootness and standing are jurisdictional doctrines defining the limits of the judicial power, our analytical approach to both should be consistent.

on the scope of Article VIII's grant of judicial power.[3] So, although our constitution does not limit our authority (as the federal constitution does) to the resolution of a "case or controversy," *see supra* ¶ 12 (noting this discrepancy), the lack of such restriction is hardly a *carte blanche* license to reach out to exercise any power we deem expedient.[4] The separation-of-powers limits on our authority are too important to be subsumed into a standardless evaluation of

---

[3] *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983) ("Inherent in the tripartite allocation of governmental powers is the historical and pragmatic conviction that particular disputes are most amenable to resolution in particular forums. The requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process."); *Baird v. State*, 574 P.2d 713, 717 (Utah 1978) ("To invoke judicial power to determine the validity of executive or legislative action, claimant must show that he has sustained or is immediately in danger of sustaining a direct injury as a result of that action. It is insufficient to assert a general interest he shares in common with all members of the public, viz., a generalized grievance.").

[4] In making this point, I am not suggesting that standing under the Utah Constitution must necessarily coincide in every particular with the federal doctrine of standing as articulated by the United States Supreme Court. Our Article VIII is not identical to its federal Article III counterpart, and there may well be differences in standing implied by the differences in the two provisions as historically understood. And the federal doctrine of standing has not always hewed consciously to the traditional conception of the federal judicial power. On occasion, the federal formulation of standing would appear to have been treated as a matter for case-by-case adjustment on grounds of pure judicial policy—grounds articulated without appropriate reference to the text or traditional understanding of the judicial power. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 609 (2007) (refusing to apply the *Flast v. Cohen,* 392 U.S. 83, 106 (1968), exception to traditional standing rules—which allows taxpayer-standing where the constitutional provision allegedly violated is a specific limitation on the taxing and spending power—to encompass discretionary executive branch expenditures and recognizing that *Flast* has been confined to its facts). And where that has happened, we would certainly be free to reach our own independent judgment as to the appropriate limitations on our power—hopefully with reference to the governing text and its traditional understanding.

the significance of a party's underlying claims. If a party's standing turns on such an evaluation, our interpretation of the scope of our power will not be taken seriously, and we will leave ourselves open to the impression (if not the reality) of arbitrariness.

¶70    Thus, I cannot accept the "public interest" test invoked by the court. I would instead interpret Article VIII of our constitution to confine the authority of the Utah courts to hear cases filed by private plaintiffs only where they vindicate "private rights," as that term was historically understood at the time of the framing of the Utah Constitution. That standard requires dismissal of all claims in this case for lack of standing.

¶71    In the sections that follow, I set forth the historical basis for the standard I would adopt, show that this standard is compatible with most all of the holdings (but not some of the dicta) from our court on the law of standing, and explain why the citizen-plaintiffs in this case lack standing.

## II. THE TRADITIONAL CONCEPTION OF STANDING

¶72    Under the framework employed in *Utah Transit Authority*, we must take seriously our role of interpreting the judicial power clause of Article VIII. And in interpreting that clause, we must examine the traditional understanding of the judicial power, identifying limits on the judicial power in established case law and in our constitutional history. If the traditional standing requirement is rooted in the constitution, it cannot be seen as a mere salutary invention of this court or as a matter within our power to "relieve" a plaintiff of fulfilling. *See supra* ¶ 13.[5] Instead, it must be understood

---

[5] For the same reasons, I am puzzled by the majority's insistence that the prescription of evolving "public interest" principles of standing is somehow "not the type of jurisprudential development . . . requir[ing] explicit textual authorization." *Supra* ¶ 16 n.9. If the majority means to suggest that we have some sort of common-law authority to extend our constitutionally granted power, then I couldn't disagree more; any common-law authority we possess is foreclosed by the limiting text of the constitution. *State v. Walker*, 2011 UT 53, ¶ 34, 267 P.3d 210  (Lee, J., concurring) ("Where the judge's primary lawmaking authority has been usurped by legislative or constitutional enactments, he cannot ignore the original meaning of the law without exceeding the bounds of his judicial authority as a secondary interpreter and not a primary lawgiver."). And if, on the other hand, the court finds some sort of *implicit* textual authority in the constitution, then it is incumbent on the court to
(continued...)

as a constraint on the exercise of judicial power that we are duty-bound to follow—just as we are with any provision of the constitution—unless and until the people repeal or amend the terms of Article VIII. As detailed below, I would find that the standing limits on our judicial power are indeed constitutionally rooted. This conclusion necessarily forecloses the majority's approach—of announcing an evolving set of discretionary standards endorsing claimants we deem "appropriate" or claims we find within the "public interest."

¶73    The starting point for this analysis, of course, is the text of Article VIII. That provision confers on our courts the "judicial power," and it speaks of our authority to issue "writs" and to decide "cases." UTAH CONST. art. VIII, §§ 1, 3, 5. These are definite terms with fixed content that place meaningful restrictions on the exercise of judicial power. First, because the power we wield must be "judicial," we are foreclosed from making law or announcing our views in an advisory or other non-judicial posture. *See, e.g., Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 23, 289 P.3d 582.[6] And second, our exercise of the judicial

---

[5] (...continued)
identify the implication it sees. Its failure to do so speaks loudly and reinforces for me what is both explicit and implicit in the grant of "judicial power," which is that we are constitutionally limited to exercise the kind of power that was traditionally, historically afforded to the courts in the issuance of "writs" and the decision of "cases."

[6] This point forecloses the majority's suggestion that the only constraint on our power (in a constitution lacking a "case or controversy" requirement) is the separation of powers proscription on our exercise of powers "'appertaining to'" one of the other branches of government. *See supra* ¶ 12 n.4 (quoting UTAH CONST. art. V, § 1). That argument misses the core point. The power we possess under the constitution is limited to that which is "judicial" in nature. We may not act in a non-judicial manner—as by issuance of an advisory opinion—even if doing so does not tread on the powers of another branch of government.

That conclusion highlights the question for resolution here, which is whether a decision on a case falling outside the scope of our traditional doctrine of standing is an appropriate exercise of "judicial power." We should answer that question, as we did in *Utah Transit Authority*, with reference to the historical limits on the judicial power in our constitutional history. And if that history cuts against public

(continued...)

power must be in the context of the issuance of "writs" or in our resolution of "cases," a formulation that implies a particular form for exercising the judicial power.[7]

¶74 Our interpretation of Article VIII, then, must be informed by an analysis of the traditional nature of the judicial power and of the types of writs and cases traditionally resolved in the courts. And in my view, the relevant history is clear. Established case law in Utah and elsewhere has long limited the judicial power to the resolution of suits brought by private parties in cases involving so-called "private rights."

¶75 Eighteenth- and nineteenth-century precedent established important limitations on the sorts of writs and cases that could be initiated by private parties and entertained by courts. The traditional formulation in the case law uniformly held that suits involving "public rights"—interests held by the public generally and not by individuals—could not be initiated by private plaintiffs.[8] Specifi

---

[6] (...continued)
interest standing, we should reject that doctrine as *ultra vires* under our constitution. For that same reason, the historical, established understanding of the judicial power is no mere "pragmatic conviction," but a constitutional requirement—one rooted in the notion of the "judicial power" that persists even "in the absence of a textual requirement of 'case or controversy' akin to those of the federal Article III." *Supra* ¶ 12 n.4.

[7] This, together with the extensive historical discussion below, is the answer to the question that the majority finds lacking in my opinion. *See supra* ¶ 16 n.9 (asserting that "the dissent does not suggest what *does* follow from our constitution's lack of a 'case or controversy' requirement"). What follows from the text and structure of our constitution is the conclusion that while our courts may not be limited to the resolution of what amounts to a federal "case or controversy," they are confined to the exercise of the "judicial power" in the issuance of "writs" and the decision of "cases." Our state constitutional regime may thus be quite close to that which governs our federal counterparts. Whatever the differences, it surely cannot be said that our judicial power is unfettered, or that it is subject to any evolving limits that we may wish to impose.

[8] Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 694 (2004) ("The question of which parties may properly come to court to vindicate . . . different kinds
(continued...)

cally, in actions involving criminal prosecutions, public nuisances, and writs of mandamus, the courts held that private individuals could not maintain actions vindicating public rights. For me, these cases establish a key element of the doctrine of standing as a gateway to the invocation of the judicial power: Private parties lack standing to sue to vindicate public rights, which must be asserted by government representatives and not by private individuals.[9]

## A. The Criminal Law Example

¶76 Since before the founding of the Utah Constitution, it has been widely "understood [that] the tort action [is] under private control and the criminal action [is] under public control." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 696 (2004). Early American courts uniformly proscribed the private prosecution of criminal actions. *Id.* at 696-700.[10] Concerns about giving private parties control over claims belonging to the general public drove this proscription. *See Fout v. State*, 4 Tenn. 98, 98–99 (1816). Courts feared that "leaving

---

[8] (...continued)
of legal rights is central to the issue of standing. . . . [I]t is worth noting . . . the ubiquity of the twin ideas of public control over public rights and private control over private rights [in early American cases].");  *see California v. San Pablo & Tulare R.R. Co.*, 149 U.S. 308, 314 (1893) ("The duty of this court, as of every judicial tribunal, is limited to determining rights of persons . . . which are actually controverted in the particular case before it."); *Bigelow v. Hartford Bridge Co.*, 14 Conn. 565, 579 (1842) ("[T]he very object of all suits, both at law and in equity," is "[t]o preserve and enforce the rights of persons, as individuals, and not as members of the community at large.").

[9] While the analysis is rooted in tradition and history, the core point is hardly new to this court. In *Jenkins v. Swan*, we concluded that "[t]he liability of one individual to another under the law . . . is a matter of private rights" and that "[p]rivate-rights disputes . . . lie at the core of the historically recognized judicial power." 675 P.2d 1145, 1149 (Utah 1983) (second and fourth alterations in original) (internal quotation marks omitted). We should hew to that traditional understanding in this case.

[10] *See* 1 JOEL PRENTISS BISHOP, COMMENTARIES ON THE LAW OF CRIMINAL PROCEDURE § 26, at 15 (Boston, Little, Brown, & Co., 2d ed. 1872) ("In all the States of our Union, and in the tribunals of the United States, criminal prosecutions are carried on by a public officer, learned in the law, and chosen for this particular purpose.").

prosecutions to every attorney who will take a fee to prosecute" would frustrate "[t]he designs of the constitution" and permit "the innocent to be oppressed or vexatiously harassed" without "the responsibility imposed by the oath of the solicitor-general[,] by his selection for the discharge of these duties, [and] by the confidence of the public reposed in him." *Id*. at 99–100; *see Markham v. Close*, 2 La. 581, 587 (1831) (worrying that private prosecutions would reflect "the promptings of envy, malice, and all uncharitableness"). Thus, as the U.S. Supreme Court put it in 1842, "from the very nature of an indictment, and the sentence thereon, the government alone has the right to control the whole proceedings and execution of the sentence." *United States v. Murphy*, 41 U.S. (16 Pet.) 203, 209 (1842).

¶77 Early Utah criminal law followed this pattern and confirms that actions by individuals to prosecute public wrongs are not within the judicial power. Utah courts carefully differentiated between the individual-specific harm typical to civil cases and the society-level harm involved in criminal matters. *See Snow v. Snow*, 43 P. 620, 622 (Utah 1896) (though a private party may benefit from a criminal contempt charge, it is imposed "to vindicate the authority and dignity of the people, as represented in and by their judicial tribunals"). Criminal process was appropriate for the latter, but not for the former. As one early opinion put it, "[criminal] punishment is not meted out as a 'balm to hurt mind.' Nor is there in the law aught of malice against him who is punished. The power is exercised by the court as the representative, in this respect, of the people,—the ultimate sovereigns,—and in their interest and for their good." *In re Whitmore*, 35 P. 524, 528–29 (Utah Terr. 1894) (internal quotation marks omitted). Thus, territorial criminal statutes required "the prosecuting attorney, or other counsel for the people, [to] open the cause, and offer the evidence in support of the indictment." *Territory v. Catton*, 16 P. 902, 908 (Utah Terr. 1888) (quoting CRIM. CODE LAWS UTAH § 257(2), (5), (6) (1878)), *rev'd on other grounds by Calton v. Utah*, 130 U.S. 83 (1889). Though courts allowed private counsel to aid public prosecutors during trial, *People v. Tidwell*, 12 P. 61, 64 (Utah Terr. 1886), I can find no instance of a private party indicting or trying a criminal suspect independent of state involvement. This is just the first of several indications that in the era of the founding of the Utah Constitution, the judicial power was understood to restrict the vindication of public rights to public officials—and to do so on the basis of a concern about the capacity of private litigants to account for the public weal and without regard to the importance of the issue involved.

## B. Nuisance Law

¶78    This limitation was not confined to criminal prosecutions, however. Under the law of "public nuisance," for example, early American courts enforced the familiar principle that "[t]he public authorities alone can complain of nuisances, while they remain public or general." *Seeley v. Bishop*, 19 Conn. 128, 135 (1848).[11] And this rule was rooted in a broader principle: "Upon general principles, that common interest, which belongs equally to all, and in which the parties suing have no special or peculiar property, will not maintain a suit." *Barr v. Stevens*, 4 Ky. (1 Bibb.) 292, 293 (1808).

¶79    Again, moreover, the proscription of private prosecution of public rights was justified by concerns about private parties' incapacity to account for broader societal interests. Thus, common-law commentators noted the need for "avoiding multiplicity of suits"[12] and of limiting defendants' exposure to a single proceeding filed by public authorities rather than allowing "every subject in the kingdome . . . to harass the offender with separate actions."[13]

¶80    Though the public nuisance rule was subject to an exception, the exception itself only confirmed the public-/private-rights distinction. It held that a public nuisance action could be maintained where the nuisance resulted in "special damage" to the plaintiff — "an injury different in kind from that of which the public complains."[14] The law in this area was settled at the time of the

---

[11] *See also, e.g., Harrison v. Sterett*, 4 H & McH. 540, 548 (Md. Prov. Ct. 1774) (argument of counsel) ("[P]ublic wrongs being a general injury to the community are to be redressed and punished by a public prosecution . . . .").

[12] 1 EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 56a (London, James & Luke G. Hansard & Sons 19th ed. 1832) (1628) (stating that "if any one man might have an action [for public nuisance], all men might have the like"); William B. Hale, *Parties to Actions*, in 15 ENCYCLOPEDIA OF PLEADING AND PRACTICE 456, 473 (William M. McKinney ed., N.Y., Edward Thompson Co. 1899) (stating that the rule "prevent[s] a multiplicity of suits").

[13] 3 WILLIAM BLACKSTONE, COMMENTARIES *219.

[14]   *Commonwealth v. Webb*, 27 Va. (6 Rand.) 726, 729 (1828); *see Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 566 (1851) ("[A] public nuisance is also a private nuisance, where a special and an irremediable mischief is done to an individual."); COKE, *supra* note 12, at 56a (stating that a man may have "an action
(continued...)

founding of the Utah Constitution. As William Hale put it in a treatise penned at about the time our Utah framers established our founding document,

> [t]he interest which an individual has in common with all other citizens or members of the state or municipality is insufficient to authorize him to maintain an action founded upon a public wrong affecting the people at large in the same manner. A party cannot vindicate the rights of others by process in his own name, nor employ civil process to punish wrongs to the public.

William B. Hale, *Parties to Actions*, in 15 ENCYCLOPEDIA OF PLEADING AND PRACTICE 456, 472-73 (William M. McKinney ed., N.Y., Edward Thompson Co. 1899) (footnote omitted).

¶81    Utah's early nuisance law is identical, in that it held that "private individuals . . . [could] not champion purely public rights." *Lewis v. Pingree Nat'l Bank*, 151 P. 558, 561 (Utah 1915). Our early cases indicate that "[n]o doubt the rule is well established that private persons may not invoke the aid of the courts to abate public nuisances, unless they can show that they suffer some special or peculiar injury or damage which is not common to the rest of the community." *Id.*; *Startup v. Harmon*, 203 P. 637, 640 (Utah 1921) (same). Not only was the plaintiff required to show special injury, but that injury was also required to be "different not merely in degree but in kind from that suffered by the public at large." *Muir v. Kay*, 244 P. 901, 905 (Utah 1925) (internal quotation marks omitted). If a different rule obtained, "a discharge in one case would be no bar to another, and thus there would be no end to litigation." *Id.* This precedent thus illustrates that, at and near the founding of the Utah Constitution, suits brought by private individuals to redress public wrongs were not the kind of "cases" subject to the judicial power.

## C. Mandamus

¶82    Early mandamus actions in other jurisdictions conform with this understanding. The general rule was consistent with the practice of reserving "public" claims for public officials and allowing private suits only for special, individualized injuries. Chief

---

[14] (...continued)
upon a [public nuisance] case" if he has "a particular damage" meaning "special damage, which is not common to others"); Hale, *supra* note 12, at 473 (same).

Justice Lemuel Shaw articulated this principle as "[u]ndoubtedly" the law in Massachusetts: "[A] private individual can apply for a writ of mandamus only in a case where he has some private or particular interest to be subserved, or some particular right to be pursued or protected by the aid of this process, independent of that which he holds in common with the public at large; and it is for the public officers exclusively to apply, where public rights are to be subserved." *In re Wellington*, 33 Mass. (16 Pick.) 87, 105 (1834).

¶83   Utah's judicial ancestry is in line with the approach prescribed by Chief Justice Shaw and squarely supports the limitation on our power overridden by the majority today. Specifically, Utah's early mandamus cases required plaintiffs to show that they had "some peculiar interest separate and distinct from that of the community in general." *Startup*, 203 P. at 640. Only then could the plaintiff satisfy Utah statutory law allowing mandamus to issue for "part[ies] beneficially interested." *See Crockett v. Bd. of Educ.*, 199 P. 158, 159–61 (Utah 1921). In *Crockett*, this court noted that "there are no fixed rules for determining" who is a beneficially interested party, but also confirmed that

> [a]ll agree . . . that mandamus proceedings should not be upheld on the part of an individual who, under the guise of correcting official delinquencies, uses the writ merely as a means of vexing and annoying public officials when he has no special or peculiar interest, as distinguished from that of the general community.

*Id.* at 160. With this in mind, the court in *Crockett* granted a tax-payer's writ to compel a school board to publish statutorily required annual financial statements because the statute involved "was designed for the benefit and interests of the citizen taxpayers so that they [could] be informed as to whether or not the financial affairs of the school district each year have been properly and lawfully conducted on the part of the board of education." *Id.* at 159–60.

¶84   In *Startup*, by contrast, the court rejected the standing of a taxpayer who sought to command a county to satisfy a statutory duty to provide funds to support widowed mothers. 203 P. at 638. The court's opinion in *Startup* analyzed the standing of a mandamus petitioner in a manner consistent with public nuisance standing: "If the nuisance affects him only in the same manner and to the same extent that it affects the people of the community in general, it is an elementary rule of practice that he would have no standing as a plaintiff in such proceeding. If, however, he is peculiarly affected or injured by the nuisance, then, under all the authorities, he has the

right to institute an action in his own name to abate the nuisance." *Id.* at 640.

¶85    Applying these principles, the *Startup* court dismissed the petitioner's claim for lack of standing because the petitioner was not part of the class protected or benefited by the statute (widowed mothers), but was instead a member of "the community in general" who "ha[d] no greater interest than any other resident." *Id.* at 640–41. Distinguishing *Crockett*, the court reiterated that the petitioner in that case had "come within the class of persons . . . specially interested in the relief applied for"—residents of a particular school district. *Id.* at 641. At the same time, the court doubted that standing would have been found in *Crockett* had the taxpayer not been such a resident. *Id.* In such case, the *Crockett* taxpayer would have been similar to the *Startup* petitioner—no more than "interested as a citizen in seeing that the law was enforced." *See id.*

¶86    Seeing "no reason" in law to sustain standing by a citizen merely interested in assuring the enforcement of the law, the court rejected the *Startup* petitioner's standing. *Id.* In so doing, the court noted that "[a]ny widowed mother of the class mentioned, for whose relief the law was enacted, would undoubtedly have the right to apply for a writ of mandate to compel an enforcement of the law," and that "[a]ny attorney authorized to represent the county . . . would have the right . . . to institute [a] proceeding." *Id.* But a "person whose relation to the case" is merely that of a citizen seeking enforcement of the law could not be sustained without "set[ting] at naught" the rules of standing in mandamus.[15] *Id.*

---

[15] The majority misses the essence of these cases in attempting to extend *Crockett v. Board of Education*, 199 P. 158 (Utah 1921), to sustain standing for the Article VI petitioners in this case. *See supra* ¶ 27 n.14. That provision—like many others in our constitution and statutes—could be said to be "designed for the public interest and benefit." *Supra* ¶ 27 n.14 (citing *Laney v. Fairview City*, 2002 UT 79, ¶ 34, 57 P.3d 1007). But the standing question for mandamus actions under our cases is not whether the law to be vindicated is designed to protect a "public interest" that encompasses the plaintiffs filing suit. It is whether the plaintiffs can be deemed to be vindicating a "special or peculiar interest" rather than "that of the general community" at large. *Crockett*, 199 P. at 160–61. The petitioner in *Crockett* was deemed to qualify because he was a member of a subset of the citizenry at large, but one specifically covered by a statute

(continued...)

D. The Root of Standing Doctrine

¶87    This historical practice of differentiating between public and private rights is fundamental. The above-cited cases distinguishing private and public rights represent not just a traditional policy preference for public control over public actions, but a principle long understood to define and establish limits on the judicial power.

¶88    Prohibiting private parties from vindicating grievances shared by the general community plays an important role in maintaining the separation of powers.[16] Thus, in the era leading up to the founding of the Utah Constitution, American courts widely accepted the public-/private-rights distinction as an element of "standing" or a limit on the gateway to the judicial power.[17] Respect

---

[15] (...continued)
aimed at those "beneficially interested in having a statement prepared and published in the manner in which the law expressly and clearly enjoins." *Id.* at 161. The petitioner in *Startup*, by contrast, was simply a member of the community at large, one who was simply "interested as a citizen in seeing that the law was enforced." *Startup*, 203 P. at 641.

As explained in greater detail below, *infra* ¶¶ 117–18, the Article VI claimants in this case fall in the latter category. Their only interest is as citizens seeking enforcement of laws that protect all Utah citizens equally. If it is enough to sustain public interest standing to note that the law being vindicated is "designed for the public interest and benefit," nothing will be left of the key distinction in *Crockett* and *Startup*. The same can be said of any law, so the majority's argument must be rejected if we are to retain any semblance of a limit on the doctrine of standing.

[16] The majority recognizes this core point at a high level of generality, conceding that the judicial power is not unlimited and that there are "certain standing requirements" that "emanate from the principle of separation of powers." *See supra* ¶ 12 n.4 (internal quotation marks omitted). But the court fails to identify any such limitations, or to assess whether the public interest exception may exceed them. Thus, the court's concession stands as an acknowledgement that its decision may tread on the principle of separation of powers—without any analysis of whether it does so.

[17] Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 691 (2004) ("[T]here was an active law of standing in the eighteenth and nineteenth centuries. To be
(continued...)

46

for that principle is essential to honoring constitutional limits on the powers of the judicial branch of government.

¶89     When we exceed our constitutional authority, we necessarily tread on ground that belongs to a coordinate branch of government. As we noted in *Jenkins v. Swan*, "[t]he requirement that a plaintiff have a personal stake in the outcome of a dispute is intended to confine the courts to a role consistent with the separation of powers, and to limit the jurisdiction of the courts to those disputes which are most efficiently and effectively resolved through the judicial process." 675 P.2d 1145, 1149 (Utah 1983). And as we explained in *Baird v. State*, "[t]o grant standing to a litigant, who cannot distinguish himself from all citizens, would be a significant inroad on the representative form of government, and cast the courts in the role of supervising the coordinate branches of government." 574 P.2d 713, 717 (Utah 1978).

¶90     When a dispute implicates commonly held public rights, the prerogative to advocate that interest belongs to the body politic generally, not to private individuals. And the advocacy of such public rights belongs either to government representatives suing for the public in court, or to the representative branches of government. As we put it in *Jenkins v. Swan*, "the airing of generalized grievances and the vindication of public rights are properly addressed to the legislature, a forum where freewheeling debate on broad issues of public policy is in order." 675 P.2d at 1149–50.

¶91     We cannot simultaneously honor these fundamental restraints on our power while defining that power through *ad hoc*, discretionary standards rooted in our sense of the "importance" of or "public interest" in the issues presented. *See Utah Transit Auth.*, 2012 UT 75, ¶¶ 17, 32 & n.18 (rejecting freestanding "public interest" exception to the mootness doctrine; noting that the doctrine is not a "principle of our own creation" which we may "abolish . . . at our whim, on the ground . . . that the question presented is sufficiently

---

[17] (...continued)
sure, early American courts did not use the term 'standing' much . . . .[b]ut eighteenth- and nineteenth-century courts were well aware of the need for proper parties, and they linked that issue to the distinction between public and private rights."); *see Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 619 (1838) (articulating a notion of the "judicial power" under which "private rights are to be enforced by judicial proceedings").

important or interesting to merit our attention").[18] These are not legal restraints on our power. They are a hollow assurance that we will exercise it only where we think it is expedient to do so. That is troubling, as it threatens to blur the lines of standing with our views on the underlying merits.

¶92    We should repudiate the public interest approach and reiterate and clarify the traditional formulation of the doctrine of standing. We should decide this case in accordance with that traditional formulation.

## III. PUBLIC INTEREST STANDING IN UTAH CASES

¶93    Our modern standing cases do not foreclose the approach I advocate; they leave plenty of room for faithful adherence to the traditional standing formulation. Prior to today's decision, our cases have only occasionally adverted to a "public interest" notion of standing, and almost always in dicta (as an alternative to traditional standing). Today the court crosses a significant, problematic line. It extends the dicta in our cases to a square holding, and does so in a manner that deprives the limits of the public interest exception of any meaningful content.

### A. The Private Right Limitation in Our Law

¶94    The holdings in most of our cases (if not always the dicta) have effectively maintained traditional limitations on standing. In *Jenkins v. Swan*, for example, we foreclosed standing in cases where "other potential plaintiffs with a more direct interest in [the] particular question" exist. 675 P.2d 1145, 1151 (Utah 1983). This holding appropriately prefers parties that meet traditional standing requirements. *See id.* at 1150 ("[T]his Court will not readily relieve a plaintiff of the . . . requirement of showing a real and personal interest in the dispute."); *York v. Unqualified Wash. Cnty. Elected Officials*, 714 P.2d 679, 680 (Utah 1986) (per curiam).

---

[18] Even proponents of "public right" standing recognize this failing. *See* John Dimanno, *Beyond Taxpayers' Suits: Public Interest Standing in the States*, 41 CONN. L. REV. 639, 667 (2008) ("[I]t leaves a great deal—perhaps too much—discretion in the hands of judges, where somewhat subjective line-drawing inevitably occurs in distinguishing between those public actions worthy of adjudication and those that are not. Another concern is that in deciding whether the doctrine applies, judges must be sure to separate the issue of standing from the merits of the case, a difficult task for any adjudicator.").

¶95 We departed from that approach to some extent in *Utah Chapter of the Sierra Club v. Utah Air Quality Board*, 2006 UT 74, 148 P.3d 960, where we outlined the parameters of an expanded "public right" standing. But that discussion was dicta and not controlling. Because the plaintiff satisfied traditional standing requirements, the court did not need to opine about an alternative (public right) standing test. *See id.* ¶ 32.[19]

¶96 To my knowledge, we have only once employed the *Sierra Club* dicta in a case where we found traditional standing lacking: in *City of Grantsville v. Redevelopment Agency of Tooele City*, 2010 UT 38, ¶ 16, 233 P.3d 461. In that case, we upheld a municipality's "alternative" standing to litigate a contract matter involving a claim for breach of a development agreement. *Id.* Yet although the *City of Grantsville* opinion upholds Grantsville City's standing on public interest grounds, *id.*, that conclusion was again unnecessary. The city, after all, was a signatory to the agreement with an express right to receive proceeds of the development, and as such it was unquestionably a third-party beneficiary[20] with a traditional, private-right interest in the contract dispute.[21] *See id.* ¶¶ 4, 6.

¶97 In *City of Grantsville* the court claimed not to reach the third-party beneficiary basis for standing. *See id.* ¶ 14 & n.2 (acknowledging that third-party beneficiaries have traditional standing to sue under a contract, but concluding not to "address this issue" because Grantsville City "does not argue it"). But in my view the court necessarily (if implicitly) relied on this ground, as

---

[19] *See Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n*, 2009 UT 48, ¶ 9, 214 P.3d 95 (finding that the plaintiff met a statutory standing requirement—which incorporated the traditional standing test—before commenting on its standing under the alternative standing test); *Haymond v. Bonneville Billing & Collections, Inc.*, 2004 UT 27, ¶ 6, 89 P.3d 171 (stating that plaintiffs failed to satisfy either the traditional or the alternative standing test).

[20] *See SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 47, 28 P.3d 669 ("Third-party beneficiaries are persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration. . . . The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear." (internal quotation marks omitted)).

[21] *See Holmes Dev., LLC v. Cook*, 2002 UT 38, ¶ 53, 48 P.3d 895 (stating that third-party beneficiaries of a contract have standing to sue under that contract).

Grantsville City's third-party beneficiary status is the only plausible legal basis for its standing.

¶98    For one thing, the City's failure to cite a third-party beneficiary basis for its standing could not have been dispositive. Standing is jurisdictional and is thus a matter the court has an obligation to consider sua sponte. *Utah Transit Auth. v. Local 382 of the Amalgamated Transit Union*, 2012 UT 75, ¶ 26 & n.17, 289 P.3d 582. And once we determine to reach an issue, we can hardly be required to blind ourselves from considering authority of relevance to its resolution.[22] So we were not at all foreclosed from relying on the city's third-party beneficiary status in upholding its standing.

¶99    And in my view the court must have relied on that status in its decision. A complete stranger to a contract would never be granted standing to sue to enforce it. *See Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 24, 285 P.3d 766 ("[Plaintiff] was deemed a stranger to the contract, and as such he had no rights to enforce it or obligations under it."). And the enforcement of a mere contract is not a matter of fundamental public importance; surely it is less so than the constitutional claims under Article X deemed insufficient by the majority today. *See supra* ¶ 35. So even the *City of Grantsville* opinion is not really authority for public interest standing generally (and certainly not public interest standing in contract actions brought by third parties); it is better viewed as endorsing the standing of a named third-party beneficiary who failed to press a third-party beneficiary argument.

¶100    This case is thus a significant milestone. It marks the first time the court has endorsed a general theory of public interest standing in a square holding. That holding is problematic on many levels. In addition to ignoring the traditional limits on our authority under Article VIII, the public interest exception undermines at least two strands of our case law requiring a real party in interest to bring its own claims.

¶101    First, rule 17 of the Utah Rules of Civil Procedure requires that "[e]very action shall be prosecuted in the name of the real party in interest." Standing overlaps with the real party in interest

---

[22] *See Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828 (considering a controlling statute not raised by the parties below and explaining that "we routinely consider new authority relevant to issues that have properly been preserved" and that "we have never prevented a party from raising controlling authority that directly bears upon a properly preserved issue").

requirement "inasmuch as both terms are used to designate a plaintiff who possesses a sufficient interest in the action to be entitled to be heard on the merits." 6A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1542 (3d ed. 2012). Courts generally define a real party in interest as "the person who is the true owner of the right sought to be enforced." *See Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008) (internal quotation marks omitted). So, even if a merely "competent" or "appropriate" party could establish standing under the proposed "public interest" principle, it would have to satisfy other rules governing parties in dispute, including the requirement that it be the true owner of the right sought to be enforced.[23]

¶102   Second, we have traditionally limited a litigant's ability to assert a third party's rights. *See Shelledy v. Lore*, 836 P.2d 786, 789 (Utah 1992). Third-party vindication of another's rights is generally proper only if "some substantial relationship between the claimant and the third parties [exists]," if it is impossible for the rightholders to assert their own constitutional rights, and if the third parties' constitutional rights would be diluted "were the assertion of jus tertii not permitted." *Id.* (internal quotation marks omitted)

¶103   We have recognized these limitations for good reason. As the U.S. Supreme Court has explained, "'courts should not adjudicate [a third party's] rights unnecessarily," as "it may be that in fact the holders of those rights . . . do not wish to assert them'" and the "third parties themselves usually will be the best proponents of their own rights." *Wilderness Soc. v. Kane Cnty.*, 632 F.3d 1162, 1171–72 (10th Cir. 2011) (second alteration in original) (quoting *Singleton v. Wulff*, 428 U.S. 106, 113 (1976)).[24] Thus, courts "should prefer to construe legal rights only when the most effective advocates of those rights are before them." *Id.* at 1172 (internal quotation marks omitted).

---

[23] *See Shurtleff v. Jay Tuft & Co.*, 622 P.2d 1168, 1172 (Utah 1980) ("A defendant has the right to have a cause of action prosecuted by the real party in interest to avoid further action on the same demand by another and to permit the defendant to assert all defenses or counterclaims available against the real owner of the cause.").

[24] *See Lyon v. Bateman*, 228 P.2d 818, 824 (Utah 1951) ("We believe the departments of the state should be first given a fair opportunity to settle their differences before being harassed by litigants who seek to have the courts render advisory judgments prematurely.").

¶104   I dissent because I see no basis in our precedent or elsewhere for abandoning these principles. I find no comfort in the fact that the approach embraced by the majority today "is not unusual in state jurisprudence." *Supra* ¶ 16. That is apparently true. But it is also beside the point if the trends in caselaw outside of Utah are incompatible with the provisions of the law that we are bound to enforce. And that is exactly how I see the authority before us.

¶105   The state precedent cited by the majority rests entirely on the faulty premise of "standing" as a judge-made principle of prudential restraint. In adopting a public interest conception of standing, these state courts have routinely ignored the governing constitutional language—with the dismissive assertion that the federal "case or controversy" limitation is not a part of the state judicial power clause. *See supra* ¶ 16 (noting that the cited opinions are "mindful that their constitutions do not impose the same restrictions on their judicial power that the federal constitution imposes on federal courts"). For reasons I've explained above, the conclusion (of unbridled, common-law power) does not at all follow from the premise (the lack of a "case or controversy" clause). Thus, the court may find persuasive the notion of standing in state court as "'a self-imposed rule of restraint'" or a "'judge-made doctrine'" that "'free[s]'" state courts to "'reject procedural frustrations in favor of'" their own subjective sense of what is a "'just and expeditious.'" *Supra* ¶ 16 n.10 (quoting 59 Am. Jur. 2d *Parties* § 30 (2012)). But I find them helpful only in highlighting the problematic foundation of the public interest doctrine of standing. We should reject that doctrine and instead follow the traditional formulation of standing that is deeply rooted in the holdings of our cases and in the text of Article VIII.

### B. The Majority's Eradication of a Meaningful "Public Interest" Standard

¶106   In upholding plaintiffs' standing to assert their Article VI claims in this case, the court not only invokes the "public interest" exception in a square holding; it stretches the exception in a manner that erases all meaningful limits on the doctrine of standing. The majority heralds its intent to preserve "strict standards" in a manner that "avoid[s] the temptation to apply a judge's own beliefs and philosophies to a determination of what questions are of great public importance." *Supra* ¶ 32 n.18 (internal quotation marks omitted). Yet the court's variation on the public interest standard eliminates any real limits, strict or otherwise, leaving the applicability of the exception to the court's unbridled discretion.

¶107   First, in repudiating any requirement that the plaintiff be a traditional claimant with an individual injury—or even the "*most appropriate party*," as our prior dicta sometimes suggested[25]—the court effectively abandons any threshold limitation based on the plaintiff's stake in the outcome of the case. The court articulates this element in terms that require a determination that the plaintiff is "'an appropriate party.'" *Supra* ¶ 15 (quoting *Cedar Mountain Envtl., Inc. v. Tooele Cnty. ex rel. Tooele Cnty. Comm'n*, 2009 UT 48, ¶ 8, 214 P.3d 95 (emphasis omitted)). But this inquiry is hardly a "test." It seems to me that it is more of a post-hoc passing grade—one crafted to justify the court's ultimate determination to reach the merits of the case.

¶108   That becomes clear when the court actually applies the test. In deeming plaintiffs "appropriate," the court says nothing that couldn't be said about any litigant with the resources to hire effective counsel (and with even the most remote interest). Perhaps it's true that plaintiffs have "done an admirable job of briefing the facts and controlling law" in this case, *supra* ¶ 29, but that is no meaningful gateway to standing. Nor is the fact that the plaintiffs have "policy concerns" and are "focus[ed] on the instant constitutional challenge." *Supra* ¶ 29 (internal quotation marks omitted). We should  require (and almost always have required) more from litigants than a showing that they are deeply worried about the case before us. Finally, the fact that plaintiffs "have caused this court to consider" the Article VI issues they have raised and to "clarify the standards they impose for the first time in decades" may ultimately be an "achievement." *Supra* ¶ 29.[26] But if so, it is a circular

---

[25] *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 800 (Utah 1986) (stating that public interest standing did not exist because there were "others who could raise the same challenges raised by [plaintiff], and who would have a greater, more direct interest in doing so"); *Jenkins v. Swan*, 675 P.2d 1145, 1150 (Utah 1983) ("If the plaintiff does not have standing under the [traditional test], we will then address the question of whether there is anyone who has a greater interest in the outcome of the case than the plaintiff. If there is no one, and if the issue is unlikely to be raised at all if the plaintiff is denied standing, this Court will grant standing.").

[26] The troublesome nature of this standard is compounded by the requirement that it be assessed not just on appeal but also at the trial court level—and, thus, by a wide range of judges whose varying

(continued...)

achievement of the court's own making. The fact that the court ultimately considered the issues presented cannot itself be a justification for agreeing to consider the issues. Plaintiffs have achieved standing only because we granted it to them. It is a bootstrap to commend that "achievement" as a *basis* for upholding standing.

¶109 The court cements the circularity of its test in its articulation of the second step of the analysis. While acknowledging the existence of plaintiffs with concrete interests in suing to challenge SB 2 (such as teachers who fail to qualify for a salary supplement under the statute or textbook publishers whose books are not approved by the statutory approval program), the court dismisses these "hypothetical" plaintiffs as irrelevant—asserting that their failure to file suit to date is enough to render "unlikely" a lawsuit by these parties. *Supra* ¶ 30. This is a striking—and deeply troubling—step in our public interest standing jurisprudence. Before today, the question was not whether directly affected parties had filed suit, but whether they existed. *See Haymond v. Bonneville Billing & Collections, Inc.*, 2004 UT 27, ¶ 10, 89 P.3d 171 (denying "public interest" standing because two classes of potential plaintiffs existed that were in a better position to bring suit). If the failure of real parties in interest to file suit is enough to sustain recognition of a member of the general public to step in as an "appropriate" party, we have defined the gateway to the judicial power out of existence.[27]

---

[26] (...continued)
views on squishy matters of "importance" and "appropriateness" will assure even more arbitrariness in application. Trial courts will rarely be in a position to assess the admirability of anticipated briefing at the threshold stage at which they will be required to determine standing. And from the trial court perspective, the "importance" of or "public interest" in an issue and the "appropriateness" of a plaintiff will likely feel suspiciously like a full-scale review of the merits of the issues. The majority's formulation of public interest standing ignores this problem, treating the matter as one left only for appellate courts to resolve. That leaves the first-line judges charged with addressing standing (trial courts) completely adrift. It also assures not only arbitrariness but protracted appeals and litigation.

[27] And we have done so, moreover, in a manner that threatens the rights and interests of the underlying real parties in interest. I rather doubt that the real parties with individualized interests implicated
(continued...)

We have assured that the jurisdictional threshold to the Utah courts depends only our subjective determination to hear a case even absent the presence of the claimant with a traditional stake in filing it.

¶110   Finally, the court's test is also circular in its assessment of the ultimate question of whether the Article VI claims asserted by plaintiffs are "of sufficient importance and general interest that claims of their violation may be brought even by plaintiffs who lack standing under the traditional criteria." *Supra* ¶ 27. Except to conclude that the Article VI issues are "part of the fundamental structure of legislative power articulated in our constitution," *supra* ¶ 27, the court offers no justification for deeming this element satisfied. And the court's further explication of the point only confirms its analytical emptiness. I see no rational, articulable basis for deeming the Article VI issues sufficiently important while rejecting the Article X issues on this score.

¶111 It is hardly an answer to note that "[n]ot every constitutional provision" is sufficiently important. *Supra* ¶ 27. That only begs the question of which ones clear the bar—and of the theoretical basis for setting the bar, or the level at which it is set. In begging these questions, the court has evaluated the importance element entirely within the confines of a black box. That not only deprives the parties in this case of an understanding of the basis of the court's decision; it also withholds from lower courts the tools needed to make these determinations going forward.

¶112   The hollow nature of the majority's standing analysis is confirmed by the court's ultimate rejection of public interest standing for the Article X claims. The court's proffered rationale—that the Article VI claims involve "restrictions which must be observed every time the legislature exercises its core function of passing laws" while the Article X claims involve a mere "a delegation of a defined subject to particular agency," *supra*

---

[27] (...continued)
by SB 2 would find their decision not to sue irrelevant. In opening the door to citizen suits supplanting claims otherwise belonging to real parties with distinct claims, we have allowed standing that threatens the integrity of the real party in interest doctrine. If this approach is taken seriously in future cases—and not, as may be the case, a one-time excuse to reach the merits in a case where they would otherwise be beyond our reach—we will surely rue this day, and just as surely be called on to dial back on this and other elements of today's opinion.

¶ 36, — is misdirection at best. Surely abiding by the constitution's power-allocation scheme is part of the legislature's "core function" that must be considered each time a law is passed. And the majority's refusal to "conclude that such questions can *never* be appropriate ones in which to employ the public–interest standing doctrine" only bears that out and emphasizes the standardless quality of this doctrine. *Supra* ¶ 36. Either the violation of a constitutional provision is important or it is not. Its importance cannot depend on the identity of the plaintiffs or the circumstances of each case, as the majority implies. *Supra* ¶ 36.

¶113 In all, the majority's distinction between the Article VI and Article X claims does not spring from meaningful analysis. It is an attempt to paper over an ultimate conclusion[28] — the court's preference for reaching one set of claims (under Article VI) while declining to reach others (under Article X).[29]

---

[28] The court seeks to answer this concern with the assurance that its decision is based "on the text and structure of our constitution" and not on "its own beliefs." *Supra* ¶ 32 n.18. That is unsatisfying, as the court points to nothing in the text or structure of the constitution that makes Article VI claims more important than Article X claims. It may be true, as the majority states, that Article VI "express[es] the intent of the people to limit legislative power and prevent special interest abuse." *Supra* ¶ 32 n.18 (internal quotation marks omitted). But Article X is a parallel limitation: In conferring power on the State Board of Education to control and supervise the public education system, Article X withholds that power from everyone else — including the legislature. *See* UTAH CONST. art. X, § 3. Thus, both Article VI and Article X constitute limitations on the legislative power. If the former limitations are fundamentally important, then so are the latter.

[29] In a sense, the Article X claims seem *more* fundamental than their Article VI counterparts, in that the former constitute substantive, separation-of-powers limits on governmental power (power reserved for the Board of Education), while the latter comprise only procedural rules for lawmaking (single-subject and clear-title requirements). If asked for my subjective assessment of the relative importance of the two sets of claims before us, I suppose I would tend to elevate the Article X claims above the Article VI claims on this basis. In any event, the court offers no basis for a contrary conclusion.

On the other hand, this factor is also problematic at its core. Public interest or importance may often cut against the propriety of the

(continued...)

¶114 The exercise of unfettered discretion is troubling, especially on a matter constituting a limit on our power under the Utah Constitution. As we explained in *Utah Transit Authority*, "on matters affecting the scope of our own power or jurisdiction, our duty to vigilantly follow the strictures of the constitution is a matter of great significance." 2012 UT 75, ¶ 26. We ignore that responsibility when we treat the constitutional limits on our power as "mere matter[s] of convenience or judicial discretion." *Id*. ¶ 27. And we undermine the fundamental notion of a written constitution when we adopt jurisdictional standards that show no fidelity to that document and seize unbridled "discretion to decide which cases should be spun out and which cut off based on some vague sense of fairness or importance of the issue." *Id*.

¶115 The public interest notion of standing cannot stand in the face of these principles. The court's extension of this doctrine here is particularly problematic, as it cements the public interest exception in a square holding, and in a manner that assures arbitrariness in its application going forward.

---

[29] (...continued)
exercise of judicial power. The matters of greatest societal interest—involving a grand, overarching balance of important public policies—are beyond the capacity of the courts to resolve. The majority acknowledges this concern, noting that "'the more generalized the issues, the more likely they ought to be resolved in the legislative or executive branches.'" *Supra* ¶ 31 (emphasis omitted) (quoting *Utah Chapter of the Sierra Club v. Utah Air Quality Bd.*, 2006 UT 74, ¶ 39, 148 P.3d 960). But the court ultimately fails to give effect to this principle. The Article VI claims presented implicate issues that are among the most generalized one could imagine—involving structural restrictions on the legislative process, which affect all citizens in a general, undifferentiated manner.

Although these seem to be precisely the sort of generalized matters calling for deference to the legislative process, the court dismisses this concern on the ground that resolution of this case does not run afoul of political question doctrine. *Supra* ¶ 31. That is unpersuasive. The justiciability bar to resolution of political questions is analytically distinct from the limits of the doctrine of standing. The latter focuses on the nature of the claimant's interest; the former concerns itself with the nature of the legal standard implicated by that interest. Each is a separate hurdle, and clearing one hurdle (political question) does not erase the need to clear the other (standing).

## IV. THE TRADITIONAL STANDING TEST APPLIED HERE

¶116   For all these reasons, we should reinforce the constitutional basis for our traditional conception of standing and repudiate the public interest exception as incompatible with our constitutional tradition. And we should vacate and dismiss this case for lack of standing.

¶117   The Article VI claims at issue here are prototypical, generalized grievances. Plaintiffs have asserted no injury peculiar to them—no interest or stake beyond that of all Utah citizens. They are complaining about the *process* that resulted in the enactment of SB 2—a process allegedly lacking the clear title and single subject required by the Utah Constitution—and not an unlawful impact of the legislation on them as private individuals.

¶118   Thus, plaintiffs are not individuals or entities with a direct stake in challenging SB 2, like the affected teachers or book publishers identified by the majority. *Supra* ¶ 30. They are Utah taxpayers asserting a generalized challenge to the propriety of the legislative process culminating in SB 2. Their standing cannot be upheld under our historical standing caselaw without doing serious violence to their core principle. *See supra* ¶¶ 72–92. They lack standing on that basis, and their case should be dismissed.

¶119   The Article X claims, on the other hand, do not belong to the plaintiffs who seek to litigate them. The Utah Board of Education is the real party in interest. We should not allow vaguely interested individuals to assert and litigate to protect the rights of a state body when that body has declined—for whatever reason—to take action.[30] The plaintiffs have not established that the Board of Education cannot properly protect its own rights. Nor have they asserted a valid, particularized injury stemming from the condemned legislation. Thus, I would dismiss both claims because they implicate the rights of third parties who are the real parties in interest, and because the plaintiffs who seek to advance these claims

---

[30] *See Raines v. Byrd*, 521 U.S. 811, 829–30 (1997) (denying standing to congressmen alleging only wholly abstract and widely dispersed institutional injury from dilution of legislative power where none were authorized to represent their respective houses and where both houses opposed the suit); *see also People Who Care v. Rockford Bd. of Educ.*, 179 F.R.D. 551, 562 (N.D. Ill. 1998) (holding that "petitioners' status as School Board members does not permit them to step into the shoes of the [School Board] and invoke its right to appeal").

cannot establish their own individual standing or satisfy the elements of the doctrine of third-party standing.

¶120   This is not the sort of case where the plaintiffs before the court are the only kinds of parties who could conceivably litigate this kind of action. Clearly there are plaintiffs out there with a direct interest in these suits — textbook publishers, science teachers, and the State Board of Education, for example. Those plaintiffs have elected not to sue. That seems significant. We should not broaden the field of proper plaintiffs just because we wish that the directly interested parties had filed suit, or because we think the issues at stake seem important or interesting. The judicial power is confined to the resolution of disputes between the parties who have a direct stake in the outcome. The plaintiffs who filed these cases do not qualify under that rubric.

¶121   The bounds of our judicial power cannot accommodate the kind of expansion that "public right" standing for merely "competent" plaintiffs involves. We cannot properly allow less than directly interested parties to litigate before us. To do so risks unrestrained decision-making based on underdeveloped facts and law and ultimately against the will and rights of those directly harmed.[31] It also risks invasion of the province of the legislature. Public dispute resolution is beyond our constitutional authority in a case filed by private plaintiffs.

---

[31]   It is perhaps for these reasons that some states either refuse to recognize "public interest" standing or maintain traditional standing requirements. *See, e.g., Henderson v. Miller,* 592 N.E.2d 570, 575 (Ill. App. Ct. 1992); *Weinlood v. Simmons*, 936 P.2d 238, 244 (Kan. 1997) ("Interests to protect the public at large must be brought by the proper public official."); *120 W. Fayette St., LLLP v. Mayor of Baltimore*, 964 A.2d 662, 669–70 (Md. 2009) (stating that taxpayer standing is granted when the disputed action "may result in a pecuniary loss to the taxpayer or an increase in taxes"), *superseded on other grounds by statute as stated in Patuxent Riverkeeper v. Md. Dep't of the Env't*, 29 A.3d 584, 586 (Md. 2011); *In re Sandy Pappas Senate Comm.*, 488 N.W.2d 795, 797–98 (Minn. 1992) (maintaining an "injury in fact" requirement); *City of Chattanooga v. Davis*, 54 S.W.3d 248, 280–81 (Tenn. 2001) (expressly refusing to adopt "public rights" standing); *Goldman v. Landsidle*, 552 S.E.2d 67, 72 (Va. 2001) (refusing to recognize general, state taxpayer standing).